**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 22-5069**
**(Consolidated with 22-7030, 22-7031)**

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

DONALD J. TRUMP,

*Defendant-Appellant,*

*v.*

JAMES BLASSINGAME AND SIDNEY HEMBY,

*Plaintiffs-Appellees.*

On Appeal from the United States District Court
for the District of Columbia, No. 21-cv-00858
Before the Honorable Judge Mehta

**BRIEF OF FORMER DIPLOMATS AND FOREIGN POLICY OFFICIALS
AS AMICI CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE**

REBECCA LEE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1 Front Street Suite 3500
San Francisco, CA 94111
(628) 235-1000

JOSEPH M. MEYER
ALAA CHAKER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

DEBO P. ADEGBILE
HILLARY CHUTTER-AMES
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
New York, NY 10007
(212) 230-8800

MARK C. FLEMING
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 STATE STREET
BOSTON, MA 02109
(617) 526-6000

September 30, 2022

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), amici curiae certify as follows:

**A.    Parties And Amici**

Except for the amici joining this brief and any other amici who had not yet entered an appearance in this case as of the filing of the appellees' brief, all parties, intervenors, and amici appearing before the district court and this Court are listed in appellant's and appellees' briefs.

**B.    Rulings Under Review**

References to the ruling at issue appear in appellant's and appellees' briefs.

**C.    Related Cases**

Related cases are listed in appellant's and appellees' briefs.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, amici curiae state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

## **D.C. CIRCUIT RULE 29(d) STATEMENT**

Pursuant to D.C. Circuit Rule 29(d), amici curiae state that this separate brief is necessary to provide amici's unique perspective on the significance of this appeal for the foreign policy of the United States.

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
CASES .................................................................................................i

CORPORATE DISCLOSURE STATEMENT ....................................................... ii

D.C. CIRCUIT RULE 29(d) STATEMENT ........................................................... iii

TABLE OF AUTHORITIES ........................................................................................v

INTEREST OF AMICI CURIAE.................................................................................1

INTRODUCTION ........................................................................................................1

ARGUMENT ...............................................................................................................4

I.    PRESIDENTIAL IMMUNITY EXISTS TO SERVE THE PUBLIC INTEREST BY
      ENABLING THE PRESIDENT TO ENGAGE IN "OFFICIAL" CONDUCT
      WITHOUT FEAR OF PERSONAL LEGAL RESPONSIBILITY ...................................4

II.   INTERFERENCE WITH THE PEACEFUL TRANSITION OF POWER IS NOT
      "OFFICIAL" CONDUCT IN WHICH PUBLIC POLICY DEMANDS THE
      PRESIDENT BE FREE TO FEARLESSLY ENGAGE ..................................................6

III.  GRANTING IMMUNITY WOULD COMPOUND THE DAMAGE ALREADY DONE
      TO THE UNITED STATES' INTERNATIONAL STANDING....................................18

CONCLUSION ..........................................................................................................23

APPENDIX:  List of Amici Curiae

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

## CASES

Page(s)

*Auriemma v. Montgomery*, 860 F.2d 273 (7th Cir. 1988) ...................................5, 20

*Clinton v. Jones*, 520 U.S. 681 (1997)...................................................................5, 6

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .......................................................2, 5, 6

**Nixon v. Fitzgerald*, 457 U.S. 731 (1982)............................ 2, 4, 5, 6, 7, 14, 18, 22

*Trump v. Vance*, 140 S. Ct. 2412 (2020) .............................................................6, 20

*United States v. Lee*, 106 U.S. 196 (1882)..........................................................19, 20

*United States v. Nixon*, 418 U.S. 683 (1974)............................................................6

*United States v. United Mine Workers of America*, 330 U.S. 258
      (1947)...........................................................................................................19, 20

## DOCKETED CASES

U.S. Amicus Brief, *Brown v. Board of Education*, 1952 WL 82045
      (U.S. Dec. 2, 1952) ...........................................................................................21

## STATUTES AND RULES

42 U.S.C. § 1985..........................................................................................................19

Federal Rule of Appellate Procedure 29 ......................................................................1

## LEGISLATIVE MATERIALS

167 Cong. Rec. H2191 (daily ed. May 11, 2021).....................................................18

S. Res. 753, 117th Cong. (2022) ...............................................................................13

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

# OTHER AUTHORITIES

Albright, Madeleine & Mehdi Jomaa, *Liberal Democracy and the
    Path to Peace and Security*, Brookings Institution (Sept. 2017),
    https://tinyurl.com/3n465sr7 ........................................................................ 15

Antonov, Anatoly & Qin Gang, *Russian and Chinese Ambassadors:
    Respecting People's Democratic Rights*, The National Interest
    (Nov. 26, 2021), https://tinyurl.com/55xx9t2d ................................................ 18

Boadle, Anthony, *Biden Envoy Told Brazil's Bolsonaro Important Not
    To Undermine Elections - Source*, Reuters (Aug. 8, 2021),
    https://tinyurl.com/3feac6v5 ......................................................................... 13

Brueckner, Markus, *Democracy and Corruption*, 14 J. Risk Financial
    Manag. 492 (2021), https://tinyurl.com/afabtr55 .......................................... 16

Chêne, Marie, *The Impact of Corruption on Growth and Inequality*,
    Transparency International (2014), https://tinyurl.com/3ffej979 ................. 16

Chinese Foreign Ministry, *The State of Democracy in the United
    States* (Dec. 5, 2021), https://tinyurl.com/582wdvpj .................................... 17

Drapalova, Eliska, *Corruption and the crisis of democracy*,
    Transparency International (Mar. 6, 2019),
    https://tinyurl.com/2s3a849c ......................................................................... 16

Dudziak, Mary L., Brown *as a Cold War Case*, 91 J. Am. Hist. 32
    (2004) ............................................................................................................ 21, 22

*Farewell Address*, in *George Washington: A Collection* 512
    (W.B. Allen ed., 1988), https://tinyurl.com/4pacvbur ..................................... 8

Feuer, Alan, *Blaming Trump, Jan. 6 Suspect Says He Fell Down a
    'Rabbit Hole' of Lies*, N.Y. Times (Apr. 13, 2022),
    https://tinyurl.com/2p2v6k2n ....................................................................... 19

Freedom House, *Freedom in the World 2022: The Global Expansion
    of Authoritarian Rule* (Feb. 2022), https://tinyurl.com/4exuh4kk ............... 17

Halperin, Morton H., et al., *The Democracy Advantage: How
    Democracies Promote Prosperity and Peace* (New York:
    Routledge 2004) ............................................................................................ 16

Imai, Kosuke & James Lo, *Robustness of Empirical Evidence for the Democratic Peace: A Nonparametric Sensitivity Analysis*, 75 Int'l Org. 901 (2021) .................................................................15

Johnson, Boris (@BorisJohnson), Twitter (Jan. 6, 2021), https://tinyurl.com/n88ye6rn ..........................................................11

Kuleba, Dmytro (@DmytroKuleba), Twitter (Jan. 6, 2021), https://tinyurl.com/mrxv6brj..........................................................12

Lieberman, Robert C., et al., *The Trump Presidency and American Democracy: A Historical and Comparative Analysis*, 17 Persp. Pol. 470 (2019) ............................................................11

Macron, Emmanuel (@EmmanuelMacron), Twitter (Jan. 6, 2021), https://tinyurl.com/2rvkxtv8 ........................................................12

Milner, Helen V. & Keiko Kubota, *Why the Move to Free Trade? Democracy and Trade Policy in Developing Countries*, 59 Int'l Org. 107 (2005), https://tinyurl.com/yeuhubku...............................16

Nicas, Jack & André Spigariol, *The Question Menacing Brazil's Elections: Coup Or No Coup?*, N.Y. Times (Aug. 22, 2022), https://tinyurl.com/4uzz6js3 ........................................................13

Oxner, Reese & Bill Chappell, *"Disgraceful": World Leaders React To Pro-Trump Extremists Storming U.S. Capitol*, NPR (Jan. 7, 2021), https://tinyurl.com/4xjtnwns.................................11

President Barack Obama, Statement on the Situation in Cote d'Ivoire (Mar. 9, 2011), https://tinyurl.com/mr29jzcf.................................12

President-Elect Barack Obama, Radio Address (Jan. 17, 2009), https://tinyurl.com/4r2pu632 ........................................................10

President Joseph Biden, Jr., *Letter from the President on the Implementation of the Global Fragility Act* (Apr. 1, 2022), https://tinyurl.com/2bcxkdxa ........................................................15

President Ronald Reagan, First Inaugural Address (Jan. 20, 1981), https://tinyurl.com/4mru8c6u ........................................................10

President Ronald Reagan, Remarks at the Western Hemisphere
        Legislative Leaders Forum (Jan. 24, 1985),
        https://tinyurl.com/59bm5cjw.......................................................................10

*Speech at Independence Hall, Philadelphia, February 22, 1861*, in
        *Abraham Lincoln: Speeches and Writings, 1859-1865*, at 213
        (Don E. Fehrenbacher ed., 1989)......................................................8

Stargardter, Gabriel & Matt Spetalnick, *CIA Chief Told Bolsonaro
        Government Not To Mess With Brazil Election, Sources Say*,
        Reuters (May 5, 2022), https://tinyurl.com/bdd2sxh8 ................................13

Statement by NSC Spokesman Mike Hammer on the Elections in Cote
        d'Ivoire (Dec. 2, 2010), https://tinyurl.com/2s35udrj ...................................12

*The Capitol Charges: Database*, NPR, https://tinyurl.com/bde5msyb
        (visited Sept. 30, 2022)...............................................................19

*The First Inaugural Speech*, in *George Washington: A Collection* 460
        (W.B. Allen ed., 1988), https://tinyurl.com/4pacvbur...................................7

United States Department of State & United States Agency for
        International Development, *Dashboard*,
        https://tinyurl.com/yc66kjdp (visited Sept. 30, 2022)...................................14

United States Department of State, *Press Statement: Cancellation of
        Istanbul Mayoral Election* (May 8, 2019),
        https://tinyurl.com/43smbw3a ......................................................13

United States Department of State, *Press Statement: Ensuring a
        Peaceful Transition in The Gambia* (Dec. 9, 2016),
        https://tinyurl.com/msj5jr5h .......................................................13

United States Department of State, Bureau of Conflict & Stabilization
        Operations, *2022 Prologue to the United States Strategy to
        Prevent Conflict and Promote Stability* (Apr. 1, 2022),
        https://tinyurl.com/yxhhzcfc.........................................................15

Wong, Edward, *Biden Puts Defense of Democracy at Center of
        Agenda, at Home and Abroad*, N.Y. Times (Sept. 6, 2022),
        https://tinyurl.com/ncww7jsy .......................................................16

V-Dem Institute, *Democracy Report 2022:  Autocratization Changing Nature?* (Mar. 2022), https://tinyurl.com/hz4hyhvc .....................................17

**INTEREST OF AMICI CURIAE**[1]

Amici curiae are 40 former diplomats and foreign policy officials who have served in both Republican and Democratic administrations.  With hundreds of years of combined public service in more than fifty countries and in senior leadership positions at the Department of State, the Department of Defense, the National Security Council, and the United States Agency for International Development, amici know from experience that the peaceful transition of power in the United States is a potent symbol of the Nation's commitment to democratic principles; that the United States' credibility and effectiveness in promoting democracy abroad begins with the example we set at home; and that democratic governance abroad fosters peace and prosperity in the United States and around the world.  Amici respectfully submit this brief to explain why these interests support denying immunity in this case.

**INTRODUCTION**

Promoting democracy abroad is a longstanding cornerstone of American foreign policy.  As former diplomats and foreign policy officials, we know firsthand that the success of this effort turns in substantial part on the Nation's

---

[1] Amici submit this brief pursuant to Federal Rule of Appellate Procedure 29(a)(2). No counsel for a party authored this brief in whole or in part, and no person other than the amici curiae or their counsel made a monetary contribution intended to fund the preparation or submission of this brief.  All parties consent to the filing of this brief.

ability to lead by example, demonstrating to the world the power, integrity, resilience, and possibilities of the American model.

One of the strongest pillars of our democracy is our tradition of peaceful transfers of power. For centuries, that tradition reaffirmed what we practice at home and encourage abroad. That tradition was broken on January 6, 2021, when a violent mob prevented Congress from certifying the results of the Electoral College for several hours until the U.S. Capitol could be secured. Worse still, the insurrection was spurred on by the outgoing president himself.

The district court correctly ruled that President Trump is not immune from civil liability for his role in inciting violence on January 6. Amici write in support of affirmance because the former president's alleged conduct not only injured the plaintiffs in this case, but also eroded the United States' ability to effectively promote democratic values abroad, with grave consequences for U.S. strategic interests. Such considerations are relevant to the legal question before this Court because President Trump "bear[s] the burden of showing that public policy requires" presidential immunity, *Harlow v. Fitzgerald*, 457 U.S. 800, 808 (1982), which exists to ensure that presidents may engage "fearlessly" in the official conduct to which the immunity applies, *Nixon v. Fitzgerald*, 457 U.S. 731, 752 (1982).

The alleged conduct here—namely, incitement of mob violence to undermine the peaceful transition of power and retain authority beyond the end of one's elected term—is emphatically not the sort of conduct in which public policy demands the president be free to fearlessly engage.  To the contrary, the former president's conduct earned international rebuke from allies and adversaries alike as inconsistent with the democratic principles the United States seeks to model at home and champion abroad.  President Trump's unprecedented subversion of the democratic process thus weakened the Nation's credibility as a democratic exemplar and reliable diplomatic partner, at a time when American leadership is needed to meet a rising autocratic tide.

President Trump's alleged conduct was also unlawful.  It caused lasting harm to the plaintiffs in this case, including Capitol Police Officers James Blassingame and Sidney Hemby, who were "attacked relentlessly" and "sprayed with chemicals" while guarding the seat of government and upholding their oath to support and defend the Constitution.  JA 43-44.  Officers Blassingame and Hemby, along with the other plaintiffs, seek to hold the former president accountable for the predictable consequences of his actions.  President Trump demands immunity, attempting to shield his role in an unprecedented assault on American democracy as an exercise of presidential duty.  It is nothing of the sort.

The Nation and world are watching to see how American institutions respond—a response which may itself reenforce or further erode the American tradition of democracy, the rule of law, and our ability to espouse those values globally.  The Court should reject President Trump's claim to immunity, reasserting the basic American principle that when it comes to the peaceful transition of power, no one—least of all our leaders—is above the law.

## ARGUMENT

### I.  PRESIDENTIAL IMMUNITY EXISTS TO SERVE THE PUBLIC INTEREST BY ENABLING THE PRESIDENT TO ENGAGE IN "OFFICIAL" CONDUCT WITHOUT FEAR OF PERSONAL LEGAL RESPONSIBILITY

Presidential immunity is born of the public's interest in protecting the president's ability to carry out the duties of the office without fear of incurring personal liability.  It is with this public interest in mind that courts determine the immunity's reach.

In *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), the Supreme Court held that a "former President of the United States[] is entitled to absolute immunity from damages liability predicated on his official acts," *id*. at 749.  In limiting the scope of immunity to conduct within the bounds of the president's "official responsibility," the Court was careful to clarify that "the sphere of protected action must be related closely to the immunity's justifying purposes."  *Id*. at 755-756.

Specifically, the doctrine of presidential immunity is shaped by the "public interest in providing [a president] the maximum ability to deal fearlessly and impartially with the duties of his office." *Nixon*, 457 U.S. at 752 (quotation marks omitted). Without immunity, the Court reasoned, the specter of "personal vulnerability frequently could distract a President from his public duties, to the detriment of … the Nation that the Presidency was designed to serve." *Id*. at 753; *see also Clinton v. Jones*, 520 U.S. 681, 693 (1997) (official immunity exists to protect the "societal interest" in providing "public officials with the maximum ability to deal fearlessly and impartially with the public").

Because presidential immunity exists "in order to advance" these "compelling public ends," *Nixon*, 457 U.S. at 758, the Court instructed in *Nixon* that in making "decisions concerning the immunity," courts must "weigh[] concerns of public policy," *id*. at 747. Thus, the Court explained in a companion case, a president "seek[ing] absolute exemption from personal liability … must bear the burden of showing that public policy requires an exemption of that scope." *Harlow v. Fitzgerald*, 457 U.S. 800, 808 (1982) (quotation marks omitted).

Consistent with these precedents, courts have long understood that whether to apply absolute immunity is a question of "public policy" that must take into account "the costs imposed upon society by absolute immunity," *Auriemma v. Montgomery*, 860 F.2d 273, 277 (7th Cir. 1988). The Supreme Court accordingly

- 5 -

has "twice denied absolute immunity claims by Presidents in cases involving allegations of serious misconduct," *Trump v. Vance*, 140 S. Ct. 2412, 2427 (2020) (citing *Clinton*, 520 U.S. at 685, and *United States v. Nixon*, 418 U.S. 683, 687 (1974)).

In sum, to determine whether presidential immunity applies in this case, this Court should ask whether the conduct alleged was "official," *Nixon*, 457 U.S. at 749—or, more precisely, within the bounds of the president's "official responsibility," *id*. at 756—and, relatedly, whether it is the type of conduct in which sound public policy demands a president be permitted to engage fearlessly. For the reasons below, President Trump has not met and cannot meet his "burden of showing that public policy requires" an "absolute exemption from personal liability," *Harlow*, 457 U.S. at 808.

## II.    INTERFERENCE WITH THE PEACEFUL TRANSITION OF POWER IS NOT "OFFICIAL" CONDUCT IN WHICH PUBLIC POLICY DEMANDS THE PRESIDENT BE FREE TO FEARLESSLY ENGAGE

As the district court and the plaintiffs in this case have ably explained, President Trump's alleged conduct on and related to January 6 was not within the bounds of his "official responsibility," *Nixon*, 457 U.S. at 756.  *See* JA 224; Appellees' Br. 34-49.  Indeed, the conduct was inimical to American democracy. That precludes the immunity President Trump seeks.  Amici write to emphasize that that conclusion is inescapable when "the scope of [the] absolute privilege" is

"defin[ed]," as it must be, in light of "the immunity's justifying purposes," *Nixon*, 457 U.S. at 755.  As explained, those purposes support immunity only for the sort of conduct in which public policy demands the president be allowed to engage "fearlessly," *id*. at 752.  The conduct alleged here is emphatically not of that character.  To the contrary, it is antithetical to—and has in fact undermined—the United States' commitment to espousing and strengthening democratic governance abroad, with consequences "to the detriment of … the Nation that the Presidency was designed to serve," *id*. at 753.

The United States' greatest asset in promoting democracy abroad is the power of its own example.  Since our Nation's earliest days, our leaders have honored the United States' role as a democratic exemplar.  Indeed, our first president declared in his First Inaugural Address that "the preservation of the sacred fire of liberty, and the destiny of the republican model of government, are justly considered as *deeply*, perhaps as *finally*, staked on the experiment entrusted to the hands of the American People."[2]  President Washington repeated this sentiment in his Farewell Address, aspiring for the United States to achieve "the glory of recommending" the American example "to the applause, the affection, and

---

[2] *The First Inaugural Speech*, in *George Washington:  A Collection* 460, 462 (W.B. Allen ed., 1988).

adoption of every nation which is yet a stranger to it."[3]  President Lincoln similarly

observed that the Declaration of Independence—and the American experiment

more broadly—establish an aspiration for liberty "not alone to the people of this

country, but hope to the world for all future time."[4]

As former diplomats and foreign policy officials, amici understand that our

leadership and effectiveness within the international community are directly tied to

the Nation's credibility as the world's preeminent democracy.  Amici have served

in countries with varying levels of democratic governance, including Afghanistan,

Andorra, Argentina, Australia, Austria, Bolivia, Bosnia and Herzegovina, Burma

(Myanmar), Canada, Colombia, Cuba, the Democratic Republic of the Congo, the

Dominican Republic, El Salvador, Estonia, Fiji, France, The Gambia, Germany,

Guinea-Bissau, Haiti, Honduras, India, Indonesia, Israel, Jordan, Kiribati, Kosovo,

Liberia, Lithuania, Luxembourg, Madagascar, Malawi, Mali, Mexico, Morocco,

Mozambique, Nauru, Nicaragua, Nigeria, Panama, Peru, the Philippines, Poland,

Russia, Senegal, Slovakia, Slovenia, Spain, Thailand, Timor-Leste, Togo, Tonga,

Turkmenistan, Tuvalu, Uganda, Ukraine, the United Kingdom, and Venezuela.  In

these and other nations, amici have sought to cultivate or strengthen popular

---

[3] *Farewell Address*, in *George Washington:  A Collection* 512, 514 (W.B. Allen ed., 1988).

[4] *Speech at Independence Hall, Philadelphia, February 22, 1861*, in *Abraham Lincoln:  Speeches and Writings, 1859-1865*, at 213 (Fehrenbacher ed., 1989).

support for democratic values and reforms; to promote free, fair, and transparent elections; to advance democratic institution-building; and to bolster transnational law-enforcement efforts.  Time and again, the impact of our efforts rose or fell with our ability to persuade our partners of the strength of the American example.

In our experience, when people around the world resist authoritarianism or agitate for democratic reform, they often do so because they aspire to the freedoms that American democracy has demonstrated and worked to enshrine.  Our democracy, despite its flaws, has thus provided hope and inspiration to citizens and subjects struggling to overcome repressive and corrupt political systems.  And when foreign leaders accept democratic reform, resist corruption, partner with democracies, or welcome technical assistance with their governing institutions, they do so in part because the United States has proven that commitment to democratic values is the key to stability, prosperity, and security.

There is no clearer symbol of the United States' commitment to its own democracy than the Nation's centuries-long track record of peaceful transitions from one president to the next.  The orderly transition between presidential administrations reaffirms that allegiance to the Nation—and respect for the democratic process—transcends partisan and parochial differences as well as personal interest.  Hence, President Reagan described the peaceful transition of

power as "nothing less than a miracle" "[i]n the eyes of many in the world,"[5] and

remarked that "those who believe in democracy and human rights should rejoice"

in the event "no matter what [their] political agenda."[6]  President Obama expressed

the same sentiment when he thanked President George W. Bush for extending a

"hand of cooperation" during the 2009 transition, noting that orderly transitions

"remind us that what we hold in common as Americans far outweighs our political

differences."[7]  On the eve of the United States' forty-third straight peaceful

transition, President Obama emphasized that "the world will be watching as

America celebrates a rite that goes to the heart of our greatness as a nation."[8]

Amici's experience confirms the symbolic and strategic importance of the

United States' history of peaceful transitions.  As diplomats deployed in young or

struggling democracies, ensuring a peaceful transition of power consistently

ranked at the top of our bilateral agenda come election season.  We counseled

losing candidates in hard-fought, close elections that accepting defeat was essential

not only to their personal political interests but also to the long-term health of the

nations they sought to lead.  To illustrate the point, we often invoked the United

---

[5] President Ronald Reagan, First Inaugural Address (Jan. 20, 1981).

[6] President Ronald Reagan, Remarks at the Western Hemisphere Legislative
Leaders Forum (Jan. 24, 1985).

[7] President-Elect Barack Obama, Radio Address (Jan. 17, 2009).

[8] *Id.*

States' yet-unbroken history of peaceful transitions as essential to the longevity and resilience of American democracy.

Against this backdrop, President Trump's conduct on and related to January 6, 2021 may be fairly regarded as a "corrosion of norms of executive restraint."[9] That conduct and the violence that ensued have been globally recognized as a threat to the fundamental principles the United States cherishes at home and promotes abroad: democracy, the rule of law, and, more specifically, the peaceful transfer of power.  British Prime Minister Boris Johnson, for instance, denounced the "[d]isgraceful scenes" at the Capitol and exhorted that a "peaceful and orderly transfer of power" was "vital" because "[t]he United States stands for democracy around the world."[10]  German Chancellor Angela Merkel said that President Trump had broken a "basic rule of democracy" and admonished him to take "responsibility so that democracy itself remains secure."[11]  French President Emmanuel Macron declared simply that "what happened today in Washington,

---

[9] Lieberman, et al., *The Trump Presidency and American Democracy: A Historical and Comparative Analysis*, 17 Persp. Pol. 470, 476 (2019).

[10] Boris Johnson (@BorisJohnson), Twitter (Jan. 6, 2021), https://tinyurl.com/n88ye6rn.

[11] Oxner & Chappell, *"Disgraceful": World Leaders React To Pro-Trump Extremists Storming U.S. Capitol*, NPR (Jan. 7, 2021).

D.C. is not America."[12]  And Ukraine's Minister of Foreign Affairs warned that restoring the "rule of law & democratic procedures" in the United States was "important not only for the U.S., but for Ukraine and the entire democratic world as well."[13]

The United States, too, has denounced foreign leaders who impede the peaceful transfer of power following free and fair elections.  For instance, when Cote d'Ivoire's incumbent President Laurent Gbagbo refused to accept defeat in 2011, the United States condemned his "incendiary rhetoric"[14] and labeled "President Gbagbo's efforts to hold on to power … an assault on the universal rights of his people and the democracy that the Cote d'Ivoire deserves."[15] Similarly, the United States "strongly condemn[ed]" Gambian President Yahya Jammeh's refusal in 2016 to accept electoral defeat as "a reprehensible and unacceptable breach of faith with the people of The Gambia and an egregious attempt to undermine a credible election process and remain in power

---

[12] Emmanuel Macron (@EmmanuelMacron), Twitter (Jan. 6, 2021), https://tinyurl.com/2rvkxtv8.

[13] Dmytro Kuleba (@DmytroKuleba), Twitter (Jan. 6, 2021), https://tinyurl.com/mrxv6brj.

[14] Statement by NSC Spokesman Mike Hammer on the Elections in Cote d'Ivoire (Dec. 2, 2010).

[15] President Barack Obama, Statement on the Situation in Cote d'Ivoire (Mar. 9, 2011).

illegitimately."[16]  More recently, when Turkey's ruling party scrapped the results of a 2019 Istanbul mayoral election won by the opposition, the United States urged that "acceptance of legitimate elections results" is "essential for any democracy."[17] This brief, moreover, is filed on the eve of a presidential election in Brazil—the world's fourth-largest democracy—in advance of which incumbent President Jair Bolsonaro has made unfounded claims of fraud and at times suggested that he might refuse to concede should he lose.[18]  In response, the U.S. Senate unanimously passed a resolution calling on the United States "to continue to speak out against efforts to incite political violence and undermine the electoral process in Brazil" and to ensure that any "bilateral United States assistance to Brazil remain[s] compliant with relevant laws of the United States related to the peaceful and democratic transition of power."[19]  The United States has reportedly engaged in quiet diplomacy to ensure a peaceful transition.[20]  Whether or not those efforts prove successful, President Trump's conduct undoubtedly undermined them.

---

[16] U.S. Dep't of State, *Press Statement*: *Ensuring a Peaceful Transition in The Gambia* (Dec. 9, 2016).

[17] U.S. Dep't of State, *Press Statement: Cancellation of Istanbul Mayoral Election* (May 8, 2019).

[18] *See* Nicas & Spigariol, *The Question Menacing Brazil's Elections: Coup Or No Coup?*, N.Y. Times (Aug. 22, 2022).

[19] S. Res. 753, 117th Cong. (2022).

[20] *See* Boadle, *Biden Envoy Told Brazil's Bolsonaro Important Not To Undermine Elections - Source*, Reuters (Aug. 8, 2021); Stargardter & Spetalnick, *CIA Chief*

By impairing our own democracy and thus our ability to promote democratic governance abroad, President Trump's conduct on and relating to January 6 has weakened the United States.  As former diplomats and foreign policy officials, amici know firsthand that the United States' failure to live by the democratic values it espouses in turn impedes efforts to build and lead coalitions, secure commitments from allies, and exert effective pressure on other nations to refrain from antidemocratic practices.  We thus speak from experience in cautioning that it is very much not in the "public interest" to ensure that presidents are free to engage "fearlessly" in conduct of the sort alleged here, *Nixon*, 457 U.S. at 752.

To the contrary, President Trump's actions worked "to the detriment of … the Nation that the Presidency was designed to serve," *Nixon*, 457 U.S. at 753. The United States does not spend billions of dollars each year on democracy and rule-of-law initiatives around the globe solely out of principle.[21]  Rather, the United States promotes democratic values—including the rule of law and, in particular, the peaceful transition of power—because stable democracies abroad promote human dignity and make the United States safer and more prosperous.

---

*Told Bolsonaro Government Not To Mess With Brazil Election, Sources Say*, Reuters (May 5, 2022).

[21] *See* U.S. Dep't of State & U.S Agency for Int'l Dev., *Dashboard* (documenting $3.182 billion for "democracy, human rights, and governance" in fiscal year 2020).

The proliferation of democratic governance reduces the likelihood of international conflict in which the United States might need to intervene, potentially at great cost, including in American lives. "[B]ecause they channel dissent through nonviolent means," democracies are less prone to armed conflict.[22] Indeed, that stable democracies tend to interact peacefully is "the closest thing we have to empirical law in the study of international relations"; remarkably, "the relationship between democracy and peace is at least five times as robust as that between smoking and lung cancer."[23] In contrast, where democratic institutions falter or do not exist, contested transitions of power lead to violent conflict, civil war, terrorism, famine, and displacement, threatening not only geopolitical stability but also the safety and welfare of Americans living, working, and traveling abroad.[24] Democracies also maintain stable alliances in times of crisis. For this reason, democracy is the keystone in the arch of the United States' cooperative

---

[22] Albright & Jomaa, *Liberal Democracy and the Path to Peace and Security*, Brookings Institution (Sept. 2017).

[23] Imai & Lo, *Robustness of Empirical Evidence for the Democratic Peace: A Nonparametric Sensitivity Analysis*, 75 Int'l Org. 901, 901 (2021).

[24] *See* U.S. Dep't of State, Bureau of Conflict & Stabilization Operations, *2022 Prologue to the United States Strategy to Prevent Conflict and Promote Stability* (Apr. 1, 2022); President Joseph Biden, Jr., *Letter from the President on the Implementation of the Global Fragility Act* (Apr. 1, 2022); Albright & Jomaa, *supra* note 22.

defense, reflected in the commitments we have made and secured under NATO and other cooperative defense treaties.

Moreover, stable democracies make effective trade partners and represent hospitable markets for American businesses, facilitating U.S. commerce, investment, and economic growth.[25]  That is in no small part because "democracy significantly reduces the risk of corruption."[26]  Indeed, "[w]hen democracy deteriorates," the predictable consequence is "an increase in corruption due to the erosion of institutional checks and balances."[27]  Corruption, in turn, reduces markets for U.S. exports, shrinks GDP, and contributes to economic inequality.[28] For all these reasons, the United States' forthcoming National Security Strategy "will highlight reinforcement of democracies as a policy priority."[29]

---

[25] *See* Milner & Kubota, *Why the Move to Free Trade?  Democracy and Trade Policy in Developing Countries*, 59 Int'l Org. 107, 112-113 (2005); Halperin, et al., *The Democracy Advantage:  How Democracies Promote Prosperity and Peace* (New York: Routledge, 2004).

[26] Brueckner, *Democracy and Corruption*, 14 J. Risk Fin. Mgmt. 492, 492 (2021).

[27] Drapalova, *Corruption and the crisis of democracy*, Transparency International (Mar. 6, 2019).

[28] Chêne, *The Impact of Corruption on Growth and Inequality*, Transparency International (2014).

[29] Wong, *Biden Puts Defense of Democracy at Center of Agenda, at Home and Abroad*, N.Y. Times (Sept. 6, 2022).

The stakes are as high now as ever, with the United States confronting a rising autocratic tide in a global debate over competing systems of governance.[30] Chinese and Russian propagandists work around the clock to disparage the American example and affect our election outcomes, all while claiming that their own systems of governance produce better results.  For instance, a week before the United States' Summit for Democracy in December 2021, the Chinese Foreign Ministry published a report claiming to "expose the deficiencies and abuse of democracy in the US."[31]  The report specifically cited "[t]he refusal of some US politicians to recognize the election results" and the ensuing insurrection on January 6 as having "severely undercut the credibility of democracy in the US," "put[ting] an end to the notion of American exceptionalism, of an eternal shining city on a hill."[32]  Meanwhile, the Chinese and Russian ambassadors to the United States published a joint op-ed touting their own systems of government and warning that "certain foreign governments better think about themselves and what

---

[30] *See* Freedom House, *Freedom in the World 2022:  The Global Expansion of Authoritarian Rule* (Feb. 2022) (documenting 16 straight years of democratic decline); V-Dem Institute, *Democracy Report 2022:  Autocratization Changing Nature?* (Mar. 2022) (documenting that "[l]iberal democracies … are now down to the lowest levels in over 25 years" and that 2021 saw "a record number of nations autocratizing").

[31] Chinese Foreign Ministry, *The State of Democracy in the United States* (Dec. 5, 2021).

[32] *Id.*

is going on in their homes."[33]  As Representative Liz Cheney noted on the House floor last year, "[a]ttacks against our democratic process and the rule of law empower our adversaries and feed Communist propaganda that American democracy is a failure."  167 Cong. Rec. H2191 (daily ed. May 11, 2021).

Because the conduct alleged here demonstrably undermined the United States' commitment to democracy at home and abroad, with resulting damage to the strategic interests served by that commitment, it is not the sort of conduct in which public policy demands the president be allowed to "fearlessly" engage, *Nixon*, 457 U.S. at 752.  Immunity is therefore unjustified.

## III.  GRANTING IMMUNITY WOULD COMPOUND THE DAMAGE ALREADY DONE TO THE UNITED STATES' INTERNATIONAL STANDING

There is no doubt that the January 6 insurrection undermined American credibility and leadership abroad, and thus our prosperity and security at home. But fortunately, that is not the end of the story.  While democracies are fragile, ours is also resilient, and is the oldest continuous democracy in the world for a reason.

Our judiciary—globally regarded as a model and symbol of the rule of law—now has a critical role to play.  American courts have risen to the occasion, providing a fair and impartial forum for hundreds of prosecutions arising out of the

---

[33] Antonov & Gang, *Russian and Chinese Ambassadors: Respecting People's Democratic Rights*, The National Interest (Nov. 26, 2021).

events of January 6.  As of this writing, over 400 participants in the Capitol riot—

many of whom claim they were acting at the direction of President Trump[34]—have

been held accountable for their actions through criminal conviction.[35]

The question now before this Court is whether citizens harmed by the events

of January 6 will be afforded the chance to hold another individual—a former

president—accountable for *his* conduct on and in relation to January 6, through

civil damages under a statute designed to provide accountability for precisely the

sort of conduct alleged here: conspiring in mob violence aimed at obstructing the

operations of the federal government, *see* 42 U.S.C. § 1985(1).  The question, in

other words, is whether a former president is above the law.

"Legal process," Justice Frankfurter once explained, "is an essential part of

the democratic process."  *United States v. United Mine Workers of America*, 330

U.S. 258, 312 (1947) (Frankfurter, J., concurring).  Thus, the Supreme Court has

long affirmed that "[n]o man in this country is so high that he is above the law."

*United States v. Lee*, 106 U.S. 196, 220 (1882).  That applies to "[a]ll the officers

of the government, from the highest to the lowest."  *Id.*  Because the law "is the

only supreme power in our system of government, … every man who by accepting

---

[34] *See, e.g.*, Feuer, *Blaming Trump, Jan. 6 Suspect Says He Fell Down a 'Rabbit Hole' of Lies*, N.Y. Times (Apr. 13, 2022).

[35] *See The Capitol Charges: Database*, NPR, https://tinyurl.com/bde5msyb (search results documenting 429 guilty pleas or convictions at trial as of this filing).

office participates in its functions is only the more strongly bound to submit to that supremacy." *Id.*; *see also United Mine Workers of America*, 330 U.S. at 312 (Frankfurter, J., concurring) ("In a democracy, power implies responsibility.  The greater the power that defies law the less tolerant can this Court be of defiance."). Following this principle, the Supreme Court has, as noted, "twice denied absolute immunity claims by Presidents in cases involving allegations of serious misconduct." *Vance*, 140 S. Ct. at 2427.

Granting immunity for the "serious misconduct" at issue here would represent a departure from this rule-of-law tradition and thus would compound the damage already done to the United States' credibility and democratic agenda abroad.  As explained, those efforts abroad pay out in security and prosperity at home.  This Court can and should consider such consequences, because whether to apply absolute immunity is a question of "public policy" that must take into account "the costs imposed upon society by absolute immunity," *Auriemma*, 860 F.2d at 277.

Nor would this be the first time a court has considered such consequences. The federal government itself argued in *Brown v. Board of Education* that "[t]he existence of discrimination against minority groups in the United States has an adverse effect upon our relations with other countries," "rais[ing] doubts even among friendly nations as to the intensity of our devotion to the democratic faith."

- 20 -

U.S. Amicus Br., *Brown v. Board of Education*, 1952 WL 82045, at *6 (U.S. Dec. 2, 1952). "[R]acial discrimination," the government explained, "furnishes grist for the Communist propaganda mills" and thus undermined U.S. efforts "to prove to the people of the world" that democracy is the "most secure form of government yet devised." *Id*. The brief also quoted Secretary of State Acheson's conclusion that the Court's failure to end school segregation would "jeopardize[] the effective maintenance of our moral leadership of the free and democratic nations of the world." *Id*. at *8. In countries around the world, Secretary Acheson reported, "the view is expressed more and more vocally that the United States is hypocritical in claiming to be the champion of democracy." *Id*. at *7.

International reaction to the Supreme Court's decision in *Brown* vindicated the government's representations. Newspapers around the world declared that "American democracy stands to gain in strength and prestige from the unanimous ruling," which "set[s] an example for all other nations," and "go[es] a long way toward dissipating the validity of the Communist contention that Western concepts of democracy are hypocritical." Dudziak, Brown *as a Cold War Case*, 91 J. Am. Hist. 32, 35-36 (2004) (quoting newspapers from India, Nigeria, and Australia). American ambassadors confirmed that the Court's decision had "done much to strengthen belief in the essential democracy of American life" by providing "a

fresh reminder of the meaning of American democracy." *Id*. at 36-37 (quoting ambassadors to Israel and Italy).

Now, as then, the United States is engaged in global competition between democratic and authoritarian systems of governance. Now, as then, our failure to live by our longstanding example furnishes grist for authoritarian propaganda mills. And now, as then, it is up to our courts to reassert basic American principles.

President Trump seeks immunity for conduct that was not only outside the scope of his "official responsibility," *Nixon*, 457 U.S. at 756, but also detrimental to the United States' democratic agenda and to all the dividends that flow from its ability to urge and support democracy abroad. This Court should hold that interference with the peaceful transition of power is not a legitimate exercise of presidential authority in the United States and reaffirm that most basic American principle: that no individual is above the law.

## CONCLUSION

The Court should affirm the district court's decision.

Respectfully submitted.

*/s/ Debo P. Adegbile*

DEBO P. ADEGBILE
HILLARY CHUTTER-AMES
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
New York, NY 10007
(212) 230-8800

MARK C. FLEMING
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 STATE STREET
BOSTON, MA 02109
(617) 526-6000

REBECCA LEE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1 Front Street Suite 3500
San Francisco, CA 94111
(628) 235-1000

JOSEPH M. MEYER
ALAA CHAKER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

September 30, 2022

# APPENDIX

## APPENDIX:  List of Amici Curiae

**Ambassador (Ret.) Daniel B. Baer**
Deputy Assistant Secretary of State for Democracy, Human Rights and Labor (2009-2013)
U.S. Ambassador to the Organization for Security and Cooperation in Europe (2013-2017)

**Rear Admiral, U.S. Navy (Ret.) James Arden Barnett, Jr.**
Chief of Public Safety & Homeland Security Bureau, Federal Communications Commission (2009-2012)
Deputy Commander, Navy Expeditionary Combat Command (2006-2008)
Director, Naval Education and Training, Pentagon (2004-2006)

**Counselor, U.S. Foreign Service (Ret.) Paul L. Boyd**
Consul General at the U. S. Mission to the Republic of Korea (2011-2014)

**Ambassador (Ret.) Steven A. Browning**
Principal Deputy Assistant Secretary of State (2009-2012)
U.S. Ambassador to Uganda (2006-2009)
U.S. Ambassador to Malawi (2003-2004)

**Ambassador (Ret.) Dwight L. Bush Sr.**
U.S. Ambassador to Morocco (2014-2017)

**Ambassador (Ret.) Judith Cefkin**
U.S. Ambassador to Fiji, Kiribati, Nauru, Tonga, and Tuvalu (2015-2018)
Senior Advisor for Burma, U.S. Department of State (2013-2015)
Deputy Chief of Mission, U.S. Embassy in Bangkok, Thailand (2010-2013)
Deputy Chief of Mission, U.S. Embassy in Sarajevo, Bosnia and Herzegovina (2006-2009)

**Akunna E. Cook**
Deputy Assistant Secretary of State for African Affairs (2021-2022)
Foreign Service Officer (2004-2013)

**Greg Craig**
White House Counsel (2009-2010)
Director, Policy Planning, U.S. Department of State (1997-1998)
Senior Advisor for National Security to Senator Edward M. Kennedy (1984-1989)

**Ambassador (Ret.) Glyn T. Davies**
U.S. Ambassador to Thailand (2015-2018)
Permanent Representative to United Nations Agencies in Vienna, Austria (2009-2011)
Acting Assistant Secretary of State for Democracy, Human Rights and Labor (2008)
Executive Secretary, National Security Council (1997-1999)

**Ambassador (Ret.) Greg Delawie**
U.S. Ambassador to Kosovo (2015-2018)
Deputy Assistant Secretary of State for Arms Control (2012-2015)
Deputy Chief of Mission, U.S. Embassy in Berlin, Germany (2009-2012)
Deputy Assistant Secretary of State for Political-Military Affairs (2008-2009)

**Ambassador (Ret.) William C. Eacho**
U.S. Ambassador to Austria (2009-2013)

**Ambassador (Ret.) John Feeley**
U.S. Ambassador to Panama (2015-2018)

**Mark Feierstein**
Principal Advisor to the Administrator, U.S. Agency for International Development (2021)
Special Assistant to the President and Senior Director for Western Hemisphere Affairs, National Security Council (2015-2017)
Assistant Administrator for Latin America and the Caribbean, U.S. Agency for International Development (2010-2015)

**Ambassador (Ret.) Robert S. Gelbard**
U.S. Ambassador to Indonesia (1999-2001)
Special Representative of President Clinton to the Balkans (1997-1999)
Assistant Secretary of State for International Narcotics and Law Enforcement (1993-1996)
Principal Deputy Assistant Secretary of State for the Western Hemisphere (1991-1993)
U.S. Ambassador to Bolivia (1988-1991)
Deputy Assistant Secretary of State for South America (1985-1988)

**Ambassador (Ret.) Ken Gross**
U.S. Ambassador to Tajikistan (2009-2012)
Deputy Chief of Mission, U.S. Embassy in Dushanbe, Tajikistan (2002-2004)

**Ambassador (Ret.) Keith M. Harper**
U.S. Ambassador and Permanent Representative to the United Nations Human
    Rights Council in Geneva, Switzerland (2014-2017)

**Ambassador (Ret.) Bruce Alan Heyman**
U.S. Ambassador to Canada (2014-2017)

**Ambassador (Ret.) Karl Hofmann**
U.S. Ambassador to Togo (2000-2002)
Executive Secretary, U.S. Department of State (2002-2005)

**Ambassador (Ret.) Vicki J. Huddleston**
Deputy Assistant Secretary of Defense for Africa (2009-2011)
U.S. Ambassador to Mali (2002-2005)
Principal Officer for Cuba, U.S. Department of State (1999-2002)
U.S. Ambassador to Madagascar (1993-1995)
Deputy Assistant Secretary of State for Africa (1995-1997)

**Ambassador (Ret.) Dennis C. Jett**
U.S. Ambassador to Peru (1996-1999)
U.S. Ambassador to Mozambique (1993-1996)
Senior Director for Africa, National Security Council (1993)

**Ambassador (Ret.) C. Donald Johnson**
U.S. Ambassador and Chief Textile Negotiator, Office of the U.S. Trade
    Representative (1998-2000)
U.S. Congressman (GA-10), member of Armed Services Committee and delegate
    to North Atlantic Assembly (1993-1995)

**Ambassador (Ret.) Laura E. Kennedy**
U.S. Ambassador to the Conference on Disarmament (2010-2013)
Deputy Assistant Secretary of State for European Affairs (2004-2005)
U.S. Ambassador to Turkmenistan (2001-2003)

**Anthony Lake**
Director, Policy Planning, U.S. Department of State (1977-1981)
National Security Advisor (1993-1997)

**Ambassador (Ret.) Hugo Llorens**
Acting U.S. Ambassador to Afghanistan (2016-2017)
U.S. Ambassador to Honduras (2008-2011)

**Ambassador (Ret.) Carmen Lomellin**
U.S. Ambassador to the Organization of American States (2009-2014)

**Ambassador (Ret.) Lewis Lukens**
Deputy Chief of Mission, U.S. Embassy in London, U.K. (2016-2019)
U.S. Ambassador to Senegal and Guinea-Bissau (2011-2014)

**Ambassador (Ret.) David McKean**
U.S. Ambassador to the Grand Duchy of Luxemboug (2016-2017)
Director, Policy Planning, U.S. Department of State (2013-2016)

**Ambassador (Ret.) James D. Melville, Jr.**
U.S. Ambassador to Estonia (2015-2018)

**Ambassador (Ret.) Thomas Pickering**
Under Secretary of State for Political Affairs (1997-2000)
U.S. Ambassador to Russia (1993-1996)
U.S. Ambassador to India (1992-1993)
U.S. Ambassador to the United Nations (1989-1992)
U.S. Ambassador to Israel (1985-1988)
U.S. Ambassador to El Salvador (1983-1985)
U.S. Ambassador to Nigeria (1981-1983)
Assistant Secretary of State for Oceans, Environment and Science (1978-1981)
U.S. Ambassador to Jordan (1974-1978)
Executive Secretary, U.S. Department of State (1973-1974)

**Ambassador (Ret.) Steven Pifer**
U.S. Ambassador to Ukraine (1998-2000)
Foreign Service Officer in Poland, the Soviet Union, and the U.K. (1978-2004)

**Major General, U.S. Army (Ret.) Randy Manner**
Acting Vice Chief, National Guard Bureau (2010-2012)
Deputy Commanding General, 3rd U.S. Army, Kuwait (2010)
Acting Director and Deputy Director, Defense Threat Reduction Agency, U.S. Department of Defense (2008-2010)

**Ambassador (Ret.) Stephen D. Mull**
Foreign Service Officer, retired at rank of Career Ambassador (1982-2018)
Acting Under Secretary of State for Political Affairs (2018)
Lead Coordinator for Iran Nuclear Implementation (2015-2017)
U.S. Ambassador to Poland (2012-2015)
Executive Secretary, U.S. Department of State (2010-2012)
Acting Assistant Secretary of State for Political-Military Affairs (2007-2008)
U.S. Ambassador to Lithuania (2003-2006)
Deputy Chief of Mission, U.S. Embassy in Jakarta, Indonesia (2000-2003)

**Ambassador (Ret.) Thomas B. Robertson**
Dean of the Leadership & Management School, U.S. Department of State (2007-2010)
U.S. Ambassador to Slovenia (2004-2007)

**Ambassador (Ret.) Theodore Sedgwick**
U.S. Ambassador to Slovakia (2010-2015)

**Cliff Sloan**
Special Envoy for Guantanamo Closure (2013-2014)
Associate Counsel to the President (1993-1995)
Assistant to the Solicitor General (1989-1991)
Associate Counsel, Office of Independent Counsel, Iran-Contra (1987-1988)

**Ambassador (Ret.) Alan D. Solomont**
U.S. Ambassador to Spain and Andorra (2010-2013)

**Ambassador (Ret.) Karen Clark Stanton**
U.S. Ambassador to Timor-Leste (2014-2017)

5a

**M. Arsalan Suleman**

Acting U.S. Special Envoy to the Organization of Islamic Cooperation (2015-2017)

Counselor for Multilateral Affairs, Bureau of Democracy, Human Rights and Labor, U.S. Department of State (2011-2015)

Deputy Special Envoy to the Organization of Islamic Cooperation (2010-2015)

**Ambassador (Ret.) Kevin Whitaker**

U.S. Ambassador to Colombia (2014-2019)

**Ambassador (Ret.) Pamela White**

U.S. Ambassador to Haiti (2012-2015)

U.S. Ambassador to The Gambia (2010-2012)

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i).

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 4,914 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


/s/ Debo P. Adegbile
DEBO P. ADEGBILE


September 30, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of September, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Debo P. Adegbile*
DEBO P. ADEGBILE