# BINNALL
## LAW GROUP

**P:** 703-888-1943 • **F:** 703-888-1930

717 King Street, Suite 200 • Alexandria, VA 22314

**Jesse R. Binnall**
PARTNER

**D:** 571-467-6566
**E:** jesse@binnall.com

July 17, 2023

The Honorable Mark Langer
Clerk of the United States Court of Appeals, District of Columbia Circuit
E. Barrett Prettyman U.S. Courthouse and William B. Bryant Annex
333 Constitution Avenue, NW
Washington, D.C. 20001

> Re: *James Blassingame and Sidney Hemby v. Donald J. Trump*
> No. 22-5069 (Consolidated with 22-7030, 22-7031)

Dear Mr. Langer,

Pursuant to FRAP 28(j), President Trump directs the Court's attention to the recent Supreme Court Opinion *Counterman v. Colorado,* --- S. Ct. ---, 2023 WL 4187751 (2023). In *Counterman,* the Supreme Court expressly found "the First Amendment precludes punishment, whether civil or criminal, unless the speaker's words were "intended" (not just likely) to produce imminent disorder." *Id.* at *5 (citations omitted). "When incitement is at issue, we have spoken in terms of specific intent, presumably equivalent to purpose or knowledge." *Id.* at *7.

In an *amicus* brief before this Court, DOJ argued the *Brandenburg* standard should be utilized in the absolute immunity analysis. *See e.g.,* DOJ Brief at 15-20 ("In the government's view, therefore, the scope of a President's absolute immunity in this context should be informed by principles analogous to those the Supreme Court has developed in defining the sort of incitement that is unprotected by the First Amendment.") Plaintiff-Appellees agreed with DOJ's position that President Trump is not immune but asked the Court not to apply DOJ's *Brandenburg* influenced standard. *See generally,* Appellee's Supplemental Brief. In their respective briefs, DOJ and Plaintiff-Appellees both pointed to the district court's determination on the incitement issues. *Id.* at n. 1; DOJ Br. at 20.

The district court considered an intent-based *Brandenburg* standard and rejected it to focus on whether "the speech 'is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.'" *Compare Thompson v. Trump,* 590 F.Supp. 3d 46, 112 (D.D.C. 2021) (citing *Brandenburg,* 395 U.S. at 447); *with Counterman,* 2023 WL 4187751 at *5. Should the Court apply DOJ's standard, this supplemental authority is relevant and decisive.

*Clerk of Court, D.C. Cir.*
*July 17, 2023*
*Page 2 of 2*

Sincerely,

/s/ Jesse R. Binnall                /s/ David A. Warrington
Jesse R. Binnall                   David A. Warrington
Molly McCann                    Jonathan M. Shaw
BINNALL LAW GROUP           Gary M. Lawkowski
                             DHILLON LAW GROUP, INC.

*Attorneys for Appellant Donald J. Trump*

Enclosure

cc: Counsel on Record

## CERTIFICATE OF SERVICE

I certify that on July 17, 2023, a copy of the foregoing 28(j) letter was filed with the Clerk of the Court United States Court of Appeals for the District Columbia Circuit by using the appellate CM/ECF system, which will send a copy to all counsel of record.

/s/ Jesse R. Binnall
Jesse R. Binnall

*Attorney for Donald J. Trump*

2023 WL 4187751

Only the Westlaw citation is currently available.

Supreme Court of the United States.

Billy Raymond COUNTERMAN, Petitioner

v.

COLORADO

No. 22-138
|
Argued April 19, 2023
|
Decided June 27, 2023

**Synopsis**

**Background:** Defendant was convicted in the Colorado District Court, Arapahoe County, F. Stephen Collins, J., of stalking (serious emotional distress) and harassment. Defendant appealed. The Colorado Court of Appeals, 497 P.3d 1039, affirmed, and the Colorado Supreme Court denied certiorari review. The United States Supreme Court granted defendant's certiorari petition.

**Holdings:** The Supreme Court, Justice Kagan, held that:

[1] the First Amendment requires proof in a criminal action regarding a true threat that the defendant had some subjective understanding of the threatening nature of his statements; abrogating *People v. Cross*, 127 P. 3d 71; *In re R. D.*, 464 P. 3d 717; and

[2] recklessness is the appropriate mens rea, consistent with the First Amendment, for a criminal conviction for communications constituting a true threat.

Vacated and remanded.

Chief Justice Roberts, Justice Alito, Justice Kavanaugh, and Justice Jackson joined the opinion of the Court.

Justice Sotomayor filed an opinion concurring in part and concurring in the judgment which Justice Gorsuch joined in part.

Justice Thomas filed a dissenting opinion.

Justice Barrett filed a dissenting opinion which Justice Thomas joined.

**Procedural Posture(s):** Appellate Review; Trial or Guilt Phase Motion or Objection.

West Headnotes (32)

**[1]**    **Constitutional Law** 🔑 **True threats**

True threats of violence lie outside the bounds of the First Amendment's protection. U.S. Const. Amend. 1.

**[2]**    **Constitutional Law** 🔑 **True threats**

A statement can count as a true threat of violence, outside the bounds of the First Amendment, based solely on its objective content. U.S. Const. Amend. 1.

**[3]**    **Constitutional Law** 🔑 **Incitement or encouragement of crime or lawless action**

First Amendment permits restrictions on incitement, or statements directed at producing imminent lawless action and likely to do so. U.S. Const. Amend. 1.

**[4]**    **Constitutional Law** 🔑 **Defamation**

First Amendment permits restrictions on defamation, or false statements of fact harming another's reputation. U.S. Const. Amend. 1.

1 Case that cites this headnote

**[5]**    **Constitutional Law** 🔑 **Obscenity in General**

First Amendment permits restrictions on obscenity, or valueless material appealing to the prurient interest and describing sexual conduct in a patently offensive way. U.S. Const. Amend. 1.

**[6]**    **Constitutional Law** 🔑 **Particular Issues and Applications in General**

Categories of speech historically unprotected by the First Amendment have been described as being of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in their proscription. U.S. Const. Amend. 1.

**[7]    Constitutional Law** 🔑 True threats

"True threats" historically unprotected by the First Amendment are serious expressions conveying that a speaker means to commit an act of unlawful violence. U.S. Const. Amend. 1.

**[8]    Threats, Stalking, and Harassment** 🔑 Intent; knowledge

Whether the speaker is aware of, and intends to convey, the threatening aspect of the message is not part of what makes a statement a threat.

**[9]    Threats, Stalking, and Harassment** 🔑 Intent; knowledge

**Threats, Stalking, and Harassment** 🔑 Apprehension of harm

The existence of a threat depends not on the mental state of the author, but on what the statement conveys to the person on the other end.

**[10]    Constitutional Law** 🔑 True threats

When the statement is understood as a true threat, all the harms that have long made threats unprotected by the First Amendment naturally follow. U.S. Const. Amend. 1.

**[11]    Constitutional Law** 🔑 True threats

"True threats," which are outside First Amendment protection, subject individuals to fear of violence and to the many kinds of disruption that fear engenders. U.S. Const. Amend. 1.

**[12]    Constitutional Law** 🔑 Freedom of Speech, Expression, and Press

Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries. U.S. Const. Amend. 1.

**[13]    Constitutional Law** 🔑 Defamation

False and defamatory statements of fact have no First Amendment value. U.S. Const. Amend. 1.

**[14]    Libel and Slander** 🔑 Criticism and comment on public matters and publication of news

A public figure cannot recover for the injury a false and defamatory statement causes unless the speaker acted with knowledge that it was false or with reckless disregard of whether it was false or not; that rule is based on fear of "self-censorship," or the worry that without such a subjective mental-state requirement, the uncertainties and expense of litigation will deter speakers from making even truthful statements. U.S. Const. Amend. 1.

**[15]    Constitutional Law** 🔑 Defamation

The First Amendment requires the protection of some falsehood from a defamation claim in order to protect speech that matters. U.S. Const. Amend. 1.

**[16]    Constitutional Law** 🔑 Incitement or encouragement of crime or lawless action

Like threats, incitement inheres in particular words used in particular contexts: its harm can arise even when a clueless speaker fails to grasp his expression's nature and consequence. U.S. Const. Amend. 1.

**[17]    Constitutional Law** 🔑 Particular Issues and Applications in General

**Constitutional Law** 🔑 Incitement or encouragement of crime or lawless action

The First Amendment precludes punishment for incitement, whether civil or criminal, unless the speaker's words were intended, not just likely, to produce imminent disorder. U.S. Const. Amend. 1.

**[18]    Constitutional Law** 🔑 **Incitement or encouragement of crime or lawless action**

Mere advocacy of illegal acts is a kind of speech falling within the First Amendment's core. U.S. Const. Amend. 1.

**[19]    Constitutional Law** 🔑 **Obscenity in General**

The First Amendment demands proof of a defendant's mindset to make out an obscenity case. U.S. Const. Amend. 1.

**[20]    Obscenity** 🔑 **Definitions; Test for Obscenity**

Obscenity is obscenity, whatever the purveyor's mental state.

**[21]    Obscenity** 🔑 **Knowledge or intent**

Punishment of obscenity depends on a vital element of scienter, often described as the defendant's awareness of the character and nature of the materials he distributed.

**[22]    Constitutional Law** 🔑 **Obscenity in General**

While obscene speech and writings are not protected, punishing their distribution without regard to scienter would have the collateral effect of inhibiting expression protected by the First Amendment; given the ambiguities inherent in the definition of obscenity, the First Amendment requires proof of scienter to avoid the hazard of self-censorship. U.S. Const. Amend. 1.

**[23]    Constitutional Law** 🔑 **True threats**

First Amendment requires proof in a criminal action regarding a true threat that the defendant had some subjective understanding of the

threatening nature of his statements; abrogating *People v. Cross,* 127 P. 3d 71, and *In re R. D.,* 464 P. 3d 717. U.S. Const. Amend. 1.

**[24]    Criminal Law** 🔑 **Criminal Intent and Malice**

Purpose is the most culpable level in the standard mental-state hierarchy, and the hardest to prove.

**[25]    Criminal Law** 🔑 **Criminal Intent and Malice**

A person acts "purposefully," for mens rea purposes, when he consciously desires a result.

**[26]    Criminal Law** 🔑 **Criminal Intent and Malice**

A person acts "knowingly," for mens rea purposes, when he is aware that a result is practically certain to follow.

**[27]    Criminal Law** 🔑 **Negligence; recklessness**

A person acts "recklessly," in the most common mens rea formulation, when he consciously disregards a substantial and unjustifiable risk that the conduct will cause harm to another; that standard involves insufficient concern with risk, rather than awareness of impending harm.

**[28]    Criminal Law** 🔑 **Negligence; recklessness**

"Recklessness," as mens rea, is morally culpable conduct, involving a deliberate decision to endanger another.

**[29]    Threats, Stalking, and Harassment** 🔑 **Intent; knowledge**

In the threats context, "recklessness" means that a speaker is aware that others could regard his statements as threatening violence and delivers them anyway.

**[30]    Criminal Law** 🔑 **Negligence; recklessness**

For mens rea purposes, a person acts "negligently" if he is not but should be aware of a substantial risk.

**[31]**  **Constitutional Law** 🔑 True threats

**Threats, Stalking, and Harassment** 🔑 Intent; knowledge

Recklessness is the appropriate mens rea, consistent with the First Amendment, for a criminal conviction for communications constituting a true threat; the State must show that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence, but need not prove any more demanding form of subjective intent to threaten another. U.S. Const. Amend. 1.

**[32]**  **Constitutional Law** 🔑 Stalking

**Threats, Stalking, and Harassment** 🔑 Intent; knowledge

To convict defendant under Colorado stalking statute prohibiting communication causing serious emotional distress, the State not only had to show only that a reasonable person would understand defendant's statements as threats, but also had to show awareness on his part that the statements could be understood that way in order to satisfy the recklessness mens rea required by the First Amendment. U.S. Const. Amend. 1; Colo. Rev. Stat. Ann. § 18-3-602(1)(c).

*Syllabus* [*]

[*]    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

**\*1**   From 2014 to 2016, petitioner Billy Counterman sent hundreds of Facebook messages to C. W., a local singer and musician. The two had never met, and C. W. did not respond. In fact, she tried repeatedly to block him, but

each time, Counterman created a new Facebook account and resumed contacting C. W. Several of his messages envisaged violent harm befalling her. Counterman's messages put C. W. in fear and upended her daily existence: C. W. stopped walking alone, declined social engagements, and canceled some of her performances. C. W. eventually contacted the authorities. The State charged Counterman under a Colorado statute making it unlawful to "[r]epeatedly ... make[ ] any form of communication with another person" in "a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person ... to suffer serious emotional distress." Colo. Rev. Stat. § 18–3–602(1)(c). Counterman moved to dismiss the charge on First Amendment grounds, arguing that his messages were not "true threats" and therefore could not form the basis of a criminal prosecution. Following Colorado law, the trial court rejected that argument under an objective standard, finding that a reasonable person would consider the messages threatening. Counterman appealed, arguing that the First Amendment required the State to show not only that his statements were objectively threatening, but also that he was aware of their threatening character. The Colorado Court of Appeals disagreed and affirmed his conviction. The Colorado Supreme Court denied review.

*Held*: The State must prove in true-threats cases that the defendant had some subjective understanding of his statements' threatening nature, but the First Amendment requires no more demanding a showing than recklessness. Pp. ____ – ____.

(a) The First Amendment permits restrictions upon the content of speech in a few limited areas. Among these historic and traditional categories of unprotected expression is true threats. True threats are "serious expression[s]" conveying that a speaker means to "commit an act of unlawful violence." *Virginia v. Black*, 538 U.S. 343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535. The existence of a threat depends not on "the mental state of the author," but on "what the statement conveys" to the person on the receiving end. *Elonis v. United States*, 575 U.S. 723, 733, 135 S.Ct. 2001, 192 L.Ed.2d 1. Yet the First Amendment may still demand a subjective mental-state requirement shielding some true threats from liability. That is because bans on speech have the potential to chill, or deter, speech outside their boundaries. An important tool to prevent that outcome is to condition liability on the State's showing of a culpable mental state. *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460. That kind of "strategic protection" features in this Court's precedent

concerning the most prominent categories of unprotected speech. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789. With regard to defamation, a public figure cannot recover for the injury such a statement causes unless the speaker acted with "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686. The same idea arises in the law respecting obscenity and incitement to unlawful conduct. See, *e.g.*, *Hess v. Indiana*, 414 U.S. 105, 109, 94 S.Ct. 326, 38 L.Ed.2d 303; *Hamling v. United States*, 418 U.S. 87, 122–123, 94 S.Ct. 2887, 41 L.Ed.2d 590. And that same reasoning counsels in favor of requiring a subjective element in a true-threats case. A speaker's fear of mistaking whether a statement is a threat, fear of the legal system getting that judgment wrong, and fear of incurring legal costs all may lead a speaker to swallow words that are in fact not true threats. Insistence on a subjective element in unprotected-speech cases, no doubt, has a cost: Even as it lessens chill of protected speech, it makes prosecution of otherwise proscribable, and often dangerous, communications harder. But a subjective standard is still required for true threats, lest prosecutions chill too much protected, non-threatening expression. Pp. ――――――.

**\*2** (b) In this context, a recklessness standard—*i.e.*, a showing that a person "consciously disregard[ed] a substantial [and unjustifiable] risk that [his] conduct will cause harm to another," *Voisine v. United States*, 579 U.S. 686, 691, 136 S.Ct. 2272, 195 L.Ed.2d 736—is the appropriate *mens rea*. Requiring purpose or knowledge would make it harder for States to counter true threats—with diminished returns for protected expression. Using a recklessness standard also fits with this Court's defamation decisions, which adopted a recklessness rule more than a half-century ago. The Court sees no reason to offer greater insulation to threats than to defamation. While this Court's incitement decisions demand more, the reason for that demand—the need to protect from legal sanction the political advocacy a hair's-breadth away from incitement—is not present here. For true threats, recklessness strikes the right balance, offering "enough 'breathing space' for protected speech," without sacrificing too many of the benefits of enforcing laws against true threats. *Elonis*, 575 U.S. at 748, 135 S.Ct. 2001. Pp. ――――――.

(c) The State prosecuted Counterman in accordance with an objective standard and did not have to show any awareness on Counterman's part of his statements' threatening character. That is a violation of the First Amendment. P. ――――.

497 P.3d 1039, vacated and remanded.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, KAVANAUGH, and JACKSON, JJ., joined. SOTOMAYOR, J., filed an opinion concurring in part and concurring in the judgment, in which GORSUCH, J., joined as to Parts I, II, III–A, and III–B. THOMAS, J., filed a dissenting opinion. BARRETT, J., filed a dissenting opinion, in which THOMAS, J., joined.

## Attorneys and Law Firms

John P. Elwood, Washington, DC, for Petitioner.

Philip J. Weiser, Attorney General, Denver, CO, for Respondent.

Eric J. Feigin, Deputy Solicitor General, Washington, DC, for United States, as amicus curiae, by special leave of the Court, supporting respondent.

Megan A. Ring, State Public Defender, Mackenzie Shields Colorado State Public Defender, Denver, CO, John E Elwood, Counsel of Record, Anthony J. Franze, Kolya D. Glick, Minjae Kim[*], Kathryn C. Reed, Arnold & Porter Kaye Scholer LLP, Washington, DC, William T. Sharon, Arnold & Porter Kaye Scholer LLP, New York, NY, for Petitioner.

Philip J. Weiser, Attorney General, Eric R. Olson, Solicitor General, Counsel of Record, Office of the Colorado, Attorney General, Denver, CO, Jillian J. Price, Deputy Attorney General, Joseph G. Michaels, Assistant Solicitor General, Helen Norton, Special Assistant Attorney, General, Talia Kraemer, Assistant Attorney General, Tara Leasar, Assistant Attorney General, Fellow, Olivia Probetts, Assistant Attorney General, Fellow, for Respondent.

[*]   Admitted outside the District of Columbia; practicing law in D.C. under the supervision of Firm principals who are D.C. Bar members.

## Opinion

Justice KAGAN delivered the opinion of the Court.

True threats of violence are outside the bounds of First Amendment protection and punishable as crimes. Today we consider a criminal conviction for communications falling within that historically unprotected category. The question

presented is whether the First Amendment still requires proof that the defendant had some subjective understanding of the threatening nature of his statements. We hold that it does, but that a mental state of recklessness is sufficient. The State must show that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence. The State need not prove any more demanding form of subjective intent to threaten another.

I

From 2014 to 2016, petitioner Billy Counterman sent hundreds of Facebook messages to C. W., a local singer and musician. The two had never met, and C. W. never responded. In fact, she repeatedly blocked Counterman. But each time, he created a new Facebook account and resumed his contacts. Some of his messages were utterly prosaic ("Good morning sweetheart"; "I am going to the store would you like anything?")—except that they were coming from a total stranger. 3 App. 465. Others suggested that Counterman might be surveilling C. W. He asked "[w]as that you in the white Jeep?"; referenced "[a] fine display with your partner"; and noted "a couple [of] physical sightings." 497 P.3d 1039, 1044 (Colo. App. 2021). And most critically, a number expressed anger at C. W. and envisaged harm befalling her: "Fuck off permanently." *Ibid.* "Staying in cyber life is going to kill you." *Ibid.* "You're not being good for human relations. Die." *Ibid.*

The messages put C. W. in fear and upended her daily existence. She believed that Counterman was "threat[ening] her] life"; "was very fearful that he was following" her; and was "afraid [she] would get hurt." 2 App. 177, 181, 193. As a result, she had "a lot of trouble sleeping" and suffered from severe anxiety. *Id.,* at 200; see *id.,* at 194–198. She stopped walking alone, declined social engagements, and canceled some of her performances, though doing so caused her financial strain. See *id.,* at 182–183, 199, 201–206, 238–239. Eventually, C. W. decided that she had to contact the authorities. *Id.,* at 184.

**\*3**  Colorado charged Counterman under a statute making it unlawful to "[r]epeatedly ... make[ ] any form of communication with another person" in "a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person ... to suffer serious emotional distress." Colo. Rev. Stat. § 18–3–602(1)(c) (2022). The only

evidence the State proposed to introduce at trial were his Facebook messages. [1]

[1]  The statute Counterman was charged with violating is titled a "stalking" statute and also prohibits "[r]epeatedly follow[ing], approach[ing], contact[ing], [or] plac[ing] under surveillance" another person. § 18–3–602(1)(c). But the State had no evidence, beyond what Counterman claimed, that he actually had followed or surveilled C. W. For example, C. W. had never noticed anything of that kind. So the prosecution based its case solely on Counterman's "[r]epeated[ ] ... communication[s]" with C. W. *Ibid.*

Counterman moved to dismiss the charge on First Amendment grounds, arguing that his messages were not "true threats" and therefore could not form the basis of a criminal prosecution. In line with Colorado law, the trial court assessed the true-threat issue using an "objective 'reasonable person' standard." *People v. Cross*, 127 P.3d 71, 76 (Colo. 2006). Under that standard, the State had to show that a reasonable person would have viewed the Facebook messages as threatening. By contrast, the State had no need to prove that Counterman had any kind of "subjective intent to threaten" C. W. *In re R. D.*, 464 P.3d 717, 731, n. 21 (Colo. 2020). The court decided, after "consider[ing] the totality of the circumstances," that Counterman's statements "r[o]se to the level of a true threat." 497 P.3d at 1045. Because that was so, the court ruled, the First Amendment posed no bar to prosecution. The court accordingly sent the case to the jury, which found Counterman guilty as charged.

The Colorado Court of Appeals affirmed. Counterman had urged the court to hold that the First Amendment required the State to show that he was aware of the threatening nature of his statements. Relying on its precedent, the court turned the request down: It "decline[d] today to say that a speaker's subjective intent to threaten is necessary" under the First Amendment to procure a conviction for threatening communications. *Id.,* at 1046 (quoting *R. D.*, 464 P.3d at 731, n. 21). Using the established objective standard, the court then approved the trial court's ruling that Counterman's messages were "true threats" and so were not protected by the First Amendment. 497 P.3d at 1050. The Colorado Supreme Court denied review.

Courts are divided about (1) whether the First Amendment requires proof of a defendant's subjective mindset in true-

threats cases, and (2) if so, what *mens rea* standard is sufficient. We therefore granted certiorari. 598 U. S. ——, 143 S.Ct. 644, 214 L.Ed.2d 382 (2023).

## II

**[1]** **[2]** True threats of violence, everyone agrees, lie outside the bounds of the First Amendment's protection. And a statement can count as such a threat based solely on its objective content. The first dispute here is about whether the First Amendment nonetheless demands that the State in a true-threats case prove that the defendant was aware in some way of the threatening nature of his communications.[2] Colorado argues that there is no such requirement. Counterman contends that there is one, based mainly on the likelihood that the absence of such a *mens rea* requirement will chill protected, non-threatening speech. Counterman's view, we decide today, is the more consistent with our precedent. To combat the kind of chill he references, our decisions have often insisted on protecting even some historically unprotected speech through the adoption of a subjective mental-state element. We follow the same path today, holding that the State must prove in true-threats cases that the defendant had some understanding of his statements' threatening character. The second issue here concerns what precise *mens rea* standard suffices for the First Amendment purpose at issue. Again guided by our precedent, we hold that a recklessness standard is enough. Given that a subjective standard here shields speech not independently entitled to protection—and indeed posing real dangers—we do not require that the State prove the defendant had any more specific intent to threaten the victim.

[2]     A preliminary clarification may be useful, concerning the difference between awareness of a communication's contents and awareness of its threatening nature. Everyone agrees, again, that the State must prove the former—and Colorado law appears to hold as much. See Colo. Rev. Stat. § 18–3–602(1)(c); Brief for Respondent 18. So, for example, if a defendant delivers a sealed envelope without knowing that a threatening letter is inside, he cannot be liable for the communication. So too (though this common example seems fairly preposterous) if a "foreigner, ignorant of the English language, who would not know the meaning of the words," somehow manages to

convey an English-language threat. *Elonis v. United States*, 575 U.S. 723, 738, 135 S.Ct. 2001, 192 L.Ed.2d 1 (2015) (internal quotation marks omitted). The question in this case arises when the defendant (unlike in those hypotheticals) understands the content of the words, but may not grasp that others would find them threatening. Must he do so, under the First Amendment, for a true-threats prosecution to succeed?

### A

**\*4** **[3]** **[4]** **[5]** **[6]** "From 1791 to the present," the First Amendment has "permitted restrictions upon the content of speech in a few limited areas." *United States v. Stevens*, 559 U.S. 460, 468, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010). These "historic and traditional categories" are "long familiar to the bar" and perhaps, too, the general public. *Ibid.* One is incitement—statements "directed [at] producing imminent lawless action," and likely to do so. *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (*per curiam*). Another is defamation—false statements of fact harming another's reputation. See *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Still a third is obscenity—valueless material "appeal[ing] to the prurient interest" and describing "sexual conduct" in "a patently offensive way." *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). This Court has "often described [those] historically unprotected categories of speech as being of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest" in their proscription. *Stevens*, 559 U.S. at 470, 130 S.Ct. 1577 (internal quotation marks omitted; emphasis deleted).

**[7]** **[8]** **[9]** **[10]** **[11]** "True threats" of violence is another historically unprotected category of communications. *Virginia v. Black*, 538 U.S. 343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003); see *United States v. Alvarez*, 567 U.S. 709, 717–718, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012) (plurality opinion). The "true" in that term distinguishes what is at issue from jests, "hyperbole," or other statements that when taken in context do not convey a real possibility that violence will follow (say, "I am going to kill you for showing up late"). *Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (*per curiam*). True threats are "serious expression[s]" conveying that a speaker means to "commit an act of unlawful violence." *Black*, 538 U.S. at 359, 123 S.Ct. 1536. Whether the speaker is aware of, and intends

to convey, the threatening aspect of the message is not part of what makes a statement a threat, as this Court recently explained. See *Elonis v. United States*, 575 U.S. 723, 733, 135 S.Ct. 2001, 192 L.Ed.2d 1 (2015). The existence of a threat depends not on "the mental state of the author," but on "what the statement conveys" to the person on the other end. *Ibid.* When the statement is understood as a true threat, all the harms that have long made threats unprotected naturally follow. True threats subject individuals to "fear of violence" and to the many kinds of "disruption that fear engenders." *Black*, 538 U.S. at 360, 123 S.Ct. 1536 (internal quotation marks omitted). The facts of this case well illustrate how.[3]

[3]    The concurrence relies on *Virginia v. Black*, 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003), to argue that the category of true threats itself incorporates a *mens rea* element. See *post*, at ——– ——, —— (SOTOMAYOR, J., concurring in part and concurring in judgment). But that claim is based on a misreading. The statements the concurrence quotes merely reflect that the statute involved in the case required a showing of intent. *Black* did not address whether the First Amendment demands such a showing, or why it might do so. See *United States v. Jeffries*, 692 F.3d 473, 479–480 (C.A.6 2012) (SUTTON, J.); see also *post*, at ——– ——, and n. 4 (BARRETT, J., dissenting) (explaining that *Black* concerned a different part of the statute, preventing consideration of contextual factors in assessing whether a statement was a threat).

[12]    Yet the First Amendment may still demand a subjective mental-state requirement shielding some true threats from liability. The reason relates to what is often called a chilling effect. Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries. A speaker may be unsure about the side of a line on which his speech falls. Or he may worry that the legal system will err, and count speech that is permissible as instead not. See *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). Or he may simply be concerned about the expense of becoming entangled in the legal system. The result is "self-censorship" of speech that could not be proscribed—a "cautious and restrictive exercise" of First Amendment freedoms. *Gertz*, 418 U.S. at 340, 94 S.Ct. 2997. And an important tool to prevent that outcome—to stop people from steering "wide[ ] of the unlawful zone"—is to condition liability on the State's showing of a culpable mental state.

*Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). Such a requirement comes at a cost: It will shield some otherwise proscribable (here, threatening) speech because the State cannot prove what the defendant thought. But the added element reduces the prospect of chilling fully protected expression. As this Court has noted, the requirement lessens "the hazard of self-censorship" by "compensat[ing]" for the law's uncertainties. *Mishkin v. New York*, 383 U.S. 502, 511, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966). Or said a bit differently: "[B]y reducing an honest speaker's fear that he may accidentally [or erroneously] incur liability," a *mens rea* requirement "provide[s] 'breathing room' for more valuable speech." *Alvarez*, 567 U.S. at 733, 132 S.Ct. 2537 (BREYER, J., concurring in judgment).

**\*5** [13]    [14]    [15]    That kind of "strategic protection" features in our precedent concerning the most prominent categories of historically unprotected speech. *Gertz*, 418 U.S. at 342, 94 S.Ct. 2997. Defamation is the best known and best theorized example. False and defamatory statements of fact, we have held, have "no constitutional value." *Id.*, at 340, 94 S.Ct. 2997; see *Alvarez*, 567 U.S. at 718–719, 132 S.Ct. 2537 (plurality opinion). Yet a public figure cannot recover for the injury such a statement causes unless the speaker acted with "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); see *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) (using the same standard for criminal libel). That rule is based on fear of "self-censorship"—the worry that without such a subjective mental-state requirement, the uncertainties and expense of litigation will deter speakers from making even truthful statements. *Sullivan*, 376 U.S. at 279, 84 S.Ct. 710. The First Amendment, we have concluded, "requires that we protect some falsehood in order to protect speech that matters." *Gertz*, 418 U.S. at 341, 94 S.Ct. 2997.

[16]    [17]    [18]    [19]    [20]    [21]    [22]    The same idea arises in the law respecting obscenity and incitement to unlawful conduct. Like threats, incitement inheres in particular words used in particular contexts: Its harm can arise even when a clueless speaker fails to grasp his expression's nature and consequence. But still, the First Amendment precludes punishment, whether civil or criminal, unless the speaker's words were "intended" (not just likely) to produce imminent disorder. *Hess v. Indiana*, 414 U.S. 105, 109, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (*per curiam*); see *Brandenburg*, 395 U.S. at 447, 89 S.Ct. 1827; *NAACP v.*

*Claiborne Hardware Co.*, 458 U.S. 886, 927–929, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). That rule helps prevent a law from deterring "mere advocacy" of illegal acts—a kind of speech falling within the First Amendment's core. *Brandenburg*, 395 U.S. at 449, 89 S.Ct. 1827. And for a similar reason, the First Amendment demands proof of a defendant's mindset to make out an obscenity case. Obscenity is obscenity, whatever the purveyor's mental state. But we have repeatedly recognized that punishment depends on a "vital element of scienter"—often described as the defendant's awareness of "the character and nature" of the materials he distributed. *Hamling v. United States*, 418 U.S. 87, 122–123, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); see *Elonis*, 575 U.S. at 739, 135 S.Ct. 2001 (reiterating *Hamling*). The rationale should by now be familiar. Yes, "obscene speech and writings are not protected." *Smith v. California*, 361 U.S. 147, 152, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959). But punishing their distribution without regard to scienter would "have the collateral effect of inhibiting" protected expression. *Id.*, at 151, 80 S.Ct. 215. Given "the ambiguities inherent in the definition of obscenity," the First Amendment "requires proof of scienter to avoid the hazard of self-censorship." *Mishkin*, 383 U.S. at 511, 86 S.Ct. 958. [4]

[4]    The dissent, in urging an objective standard here, reads the obscenity decisions as requiring merely that the defendant know "what the material depicts" (as a speaker must know a communication's contents). *Post*, at —— – —— (opinion of BARRETT, J.) (relying on *Hamling*, 418 U.S. at 120–123, 94 S.Ct. 2887). But see the statements quoted above: That is not what they say. And indeed, this Court recently rejected the dissent's revisionist reading, explaining in detail —and in response to a near-identical argument— that the obscenity decisions demand awareness of "the *character* of [the materials,] not simply [their] contents." *Elonis*, 575 U.S. at 739–740, 135 S.Ct. 2001 (discussing *Hamling*, 418 U.S. at 120–123, 94 S.Ct. 2887, and *Mishkin*, 383 U.S. at 510, 86 S.Ct. 958).

The dissent's use of two other First Amendment categories—fighting words and false commercial speech—to support an objective test also falls flat. See *post*, at —— – —— (opinion of BARRETT, J.). This Court has not upheld a conviction under the fighting-words doctrine in 80 years. At the least, that doctrine is today a poor candidate for spinning off other First Amendment rules. False

commercial speech is also a poor analog, though for different reasons. Put aside that the line of cases the dissent invokes has never been listed among the historically unprotected categories of speech. See, *e.g.*, *United States v. Stevens*, 559 U.S. 460, 468, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010); see *supra*, at ——. Yet more relevant, the Court has often noted that commercial speech is less vulnerable to chill than most other speech. See, *e.g.*, *Board of Trustees of State Univ. of N. Y. v. Fox*, 492 U.S. 469, 481, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). And it is the fear of chill that has led to state-of-mind requirements in the context of unprotected speech.

**\*6  [23]**  The same reasoning counsels in favor of requiring a subjective element in a true-threats case. This Court again must consider the prospect of chilling non-threatening expression, given the ordinary citizen's predictable tendency to steer "wide[ ] of the unlawful zone." *Speiser*, 357 U.S. at 526, 78 S.Ct. 1332. The speaker's fear of mistaking whether a statement is a threat; his fear of the legal system getting that judgment wrong; his fear, in any event, of incurring legal costs —all those may lead him to swallow words that are in fact not true threats. Some 50 years ago, Justice Marshall made the point when reviewing a true-threats prosecution arguably involving only political hyperbole. See *Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975). The Court in *Rogers* reversed the conviction on other grounds, but Justice Marshall focused on the danger of deterring non-threatening speech. An objective standard, turning only on how reasonable observers would construe a statement in context, would make people give threats "a wide berth." *Id.*, at 47, 95 S.Ct. 2091 (concurring opinion). And so use of that standard would discourage the "uninhibited, robust, and wide-open debate that the First Amendment is intended to protect." *Id.*, at 48, 95 S.Ct. 2091 (quoting *Sullivan*, 376 U.S. at 270, 84 S.Ct. 710).

The reasoning—and indeed some of the words—came straight from this Court's decisions insisting on a subjective element in other unprotected-speech cases, whether involving defamation, incitement, or obscenity. No doubt, the approach in all of those cases has a cost: Even as it lessens chill of protected speech, it makes prosecution of otherwise proscribable, and often dangerous, communications harder. And the balance between those two effects may play out differently in different contexts, as the next part of this opinion discusses. But the ban on an objective standard remains the same, lest true-threats prosecutions chill too much protected, non-threatening expression.

B

**[24] [25] [26] [27] [28] [29] [30]** The next question concerns the type of subjective standard the First Amendment requires. The law of *mens rea* offers three basic choices. Purpose is the most culpable level in the standard mental-state hierarchy, and the hardest to prove. A person acts purposefully when he "consciously desires" a result—so here, when he wants his words to be received as threats. *United States v. Bailey*, 444 U.S. 394, 404, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980). Next down, though not often distinguished from purpose, is knowledge. *Ibid.* A person acts knowingly when "he is aware that [a] result is practically certain to follow"—so here, when he knows to a practical certainty that others will take his words as threats. *Ibid.* (internal quotation marks omitted). A greater gap separates those two from recklessness. A person acts recklessly, in the most common formulation, when he "consciously disregard[s] a substantial [and unjustifiable] risk that the conduct will cause harm to another." *Voisine v. United States*, 579 U.S. 686, 691, 136 S.Ct. 2272, 195 L.Ed.2d 736 (2016) (internal quotation marks omitted). That standard involves insufficient concern with risk, rather than awareness of impending harm. See *Borden v. United States*, 593 U. S. ——, ——, 141 S.Ct. 1817, 1823–1824, 210 L.Ed.2d 63 (2021) (plurality opinion). But still, recklessness is morally culpable conduct, involving a "deliberate decision to endanger another." *Voisine*, 579 U.S. at 694, 136 S.Ct. 2272. In the threats context, it means that a speaker is aware "that others could regard his statements as" threatening violence and "delivers them anyway." *Elonis*, 575 U.S. at 746, 135 S.Ct. 2001 (ALITO, J., concurring in part and dissenting in part).[5]

[5] Just to complete the *mens rea* hierarchy, the last level is negligence—but that is an objective standard, of the kind we have just rejected. A person acts negligently if he is not but should be aware of a substantial risk—here, that others will understand his words as threats. See *Borden*, 593 U. S., at ——, 141 S.Ct., at 1823–1824 (plurality opinion). That makes liability depend not on what the speaker thinks, but instead on what a reasonable person would think about whether his statements are threatening in nature. See *Elonis*, 575 U.S. at 738, 135 S.Ct. 2001 ("Having liability turn on whether a reasonable person regards the communication as a threat—regardless of what the defendant thinks—reduces culpability ... to negligence" (internal quotation marks omitted)).

**\*7** Among those standards, recklessness offers the right path forward. We have so far mostly focused on the constitutional interest in free expression, and on the correlative need to take into account threat prosecutions' chilling effects. But the precedent we have relied on has always recognized—and insisted on "accommodat[ing]"—the "competing value[ ]" in regulating historically unprotected expression. *Gertz*, 418 U.S. at 348, 94 S.Ct. 2997. Here, as we have noted, that value lies in protecting against the profound harms, to both individuals and society, that attend true threats of violence —as evidenced in this case. See *supra*, at ——, ——. The injury associated with those statements caused history long ago to place them outside the First Amendment's bounds. When despite that judgment we require use of a subjective mental-state standard, we necessarily impede some true-threat prosecutions. And as we go up the subjective *mens rea* ladder, that imposition on States' capacity to counter true threats becomes still greater—and, presumably, with diminishing returns for protected expression. In advancing past recklessness, we make it harder for a State to substantiate the needed inferences about *mens rea* (absent, as is usual, direct evidence). And of particular importance, we prevent States from convicting morally culpable defendants. See *Elonis*, 575 U.S. at 745, 135 S.Ct. 2001 (opinion of ALITO, J.). For reckless defendants have done more than make a bad mistake. They have consciously accepted a substantial risk of inflicting serious harm.

Using a recklessness standard also fits with the analysis in our defamation decisions. As noted earlier, the Court there adopted a recklessness rule, applicable in both civil and criminal contexts, as a way of accommodating competing interests. See *supra*, at —— – ——. In the more than half-century in which that standard has governed, few have suggested that it needs to be higher—in other words, that still more First Amendment "breathing space" is required. *Gertz*, 418 U.S. at 342, 94 S.Ct. 2997. And we see no reason to offer greater insulation to threats than to defamation. See *Elonis*, 575 U.S. at 748, 135 S.Ct. 2001 (opinion of ALITO, J.). The societal interests in countering the former are at least as high. And the protected speech near the borderline of true threats (even though sometimes political, as in *Rogers*) is, if anything, further from the First Amendment's central concerns than the chilled speech in *Sullivan*-type cases (*i.e.*, truthful reputation-damaging statements about public officials and figures).

It is true that our incitement decisions demand more—but the reason for that demand is not present here. When incitement is at issue, we have spoken in terms of specific intent, presumably equivalent to purpose or knowledge. See *Hess*, 414 U.S. at 109, 94 S.Ct. 326; *supra*, at ——. In doing so, we recognized that incitement to disorder is commonly a hair's-breadth away from political "advocacy"—and particularly from strong protests against the government and prevailing social order. *Brandenburg*, 395 U.S. at 447, 89 S.Ct. 1827. Such protests gave rise to all the cases in which the Court demanded a showing of intent. See *ibid.*; *Hess*, 414 U.S. at 106, 94 S.Ct. 326; *Claiborne Hardware Co.*, 458 U.S. at 888, 928, 102 S.Ct. 3409. And the Court decided those cases against a resonant historical backdrop: the Court's failure, in an earlier era, to protect mere advocacy of force or lawbreaking from legal sanction. See, *e.g.*, *Whitney v. California*, 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927); *Gitlow v. New York*, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925); *Abrams v. United States*, 250 U.S. 616, 40 S.Ct. 17, 63 L.Ed. 1173 (1919). A strong intent requirement was, and remains, one way to guarantee history was not repeated. It was a way to ensure that efforts to prosecute incitement would not bleed over, either directly or through a chilling effect, to dissenting political speech at the First Amendment's core. But the potency of that protection is not needed here. For the most part, the speech on the other side of the true-threats boundary line—as compared with the advocacy addressed in our incitement decisions—is neither so central to the theory of the First Amendment nor so vulnerable to government prosecutions. It is not just that our incitement decisions are distinguishable; it is more that they compel the use of a distinct standard here. [6]

6     Our obscenity decisions are of no help in this inquiry, because the Court has never determined the precise *mens rea* needed to impose punishment. In arguing the contrary, the concurrence relies mainly on *Hamling*. *Post*, at —— – —— (opinion of SOTOMAYOR, J.). But if the dissent is wrong in saying that *Hamling* (and other obscenity decisions) allowed an objective inquiry, see *supra*, at ——, n. 4, the concurrence is wrong in suggesting that it required use of a purpose or knowledge standard. As to the concurrence's claim, *Hamling* held only that a statute with that standard was "constitutionally sufficient." 418 U.S. at 123, 94 S.Ct. 2887. The decision said nothing about whether it was constitutionally necessary,

or instead whether a recklessness standard would suffice as well.

**\*8** [31] That standard, again, is recklessness. It offers "enough 'breathing space' for protected speech," without sacrificing too many of the benefits of enforcing laws against true threats. *Elonis*, 575 U.S. at 748, 135 S.Ct. 2001 (opinion of ALITO, J.). As with any balance, something is lost on both sides: The rule we adopt today is neither the most speech-protective nor the most sensitive to the dangers of true threats. But in declining one of those two alternative paths, something more important is gained: Not "having it all"—because that is impossible—but having much of what is important on both sides of the scale. [7]

7     The dissent accuses the Court of making a "Goldilocks judgment" in favoring a recklessness standard. *Post*, at —— (opinion of BARRETT, J.). But in law, as in life, there are worse things than being "just right."

### III

[32] It is time to return to Counterman's case, though only a few remarks are necessary. Counterman, as described above, was prosecuted in accordance with an objective standard. See *supra*, at ——. The State had to show only that a reasonable person would understand his statements as threats. It did not have to show any awareness on his part that the statements could be understood that way. For the reasons stated, that is a violation of the First Amendment.

We accordingly vacate the judgment of the Colorado Court of Appeals and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered*.

Justice SOTOMAYOR, with whom Justice GORSUCH joins as to Parts I, II, III–A, and III–B, concurring in part and concurring in the judgment.
When the government seeks to punish speech based on its content, the First Amendment typically imposes stringent requirements. This ensures that the government, even when pursuing compelling objectives, does not unduly burden our Nation's commitment to free expression. "From 1791 to the present, however, the First Amendment has permitted restrictions upon the content of speech in a few limited areas."

*United States v. Stevens*, 559 U.S. 460, 468, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (internal quotation marks omitted). These categories must be "well-defined and narrowly limited" in light of the serious consequences that flow from carving out speech from ordinary First Amendment protections. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

"True threats" are one such category, and there is a tradition of criminalizing threats stretching back centuries. This includes punishing single utterances based on the message conveyed. One paradigmatic example of this would be writing and mailing a letter threatening to assassinate the President. Such laws are plainly important. There is no longstanding tradition, however, of punishing speech merely because it is unintentionally threatening. Instead, this Court's precedent, along with historical statutes and cases, reflect a commonsense understanding that threatening someone is an intentional act. As to what intent is needed, "[t]raditionally, one intends certain consequences when he desires that his acts cause those consequences or knows that those consequences are substantially certain to result from his acts." *Tison v. Arizona*, 481 U.S. 137, 150, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (internal quotation marks omitted). This does not require showing that an individual intends to carry through with the threat. But it does require showing that an individual desires to threaten or is substantially certain that her statements will be understood as threatening.

Today, unfortunately, the Court unnecessarily departs from this traditional understanding. That is not to say that I disagree with the Court on everything. Far from it. I join the Court's conclusion that some subjective *mens rea* is required in true-threats cases. I also agree that in this particular case, where petitioner was prosecuted for stalking that involved threatening statements, a *mens rea* of recklessness is amply sufficient. Where I part ways with the Court is that I would not reach the distinct and more complex question whether a *mens rea* of recklessness is sufficient for true-threats prosecutions generally. Further, requiring nothing more than a *mens rea* of recklessness is inconsistent with precedent, history, and the commitment to even harmful speech that the First Amendment enshrines. I therefore respectfully concur only in part and in the judgment.

I

**\*9** As an initial matter, I do not believe that this Court should reach the question whether recklessness is sufficient for true-threats prosecutions. A key conceptual distinction is helpful for explaining why. On the one hand, there are statements that are objectively threatening. In some cases, such statements can be punished because they fall into the unprotected category of "true threats." Yet such statements can also be punished if they fall into another category of unprotected speech, such as speech integral to criminal conduct. Or they might warrant less First Amendment protection for other reasons. On the other hand, there is the question of what constitutes the well-defined and longstanding category of unprotected true threats. It is with this latter question that I do not see the need to address whether a *mens rea* of recklessness is sufficient across the board.

First, the courts below did not address whether recklessness was sufficient to prosecute true threats and neither of the actual parties have advocated a recklessness standard. Colorado disclaimed the idea that recklessness was required, and petitioner asserted, correctly, that recklessness had not been raised under traditional principles of party presentation. The briefing on recklessness consists almost entirely of a few pages of an argument in the alternative at the tail end of an *amicus* brief filed by the United States.

Second, because petitioner was prosecuted for stalking involving threatening speech, this case does not require resort to the true-threats exemption to the First Amendment.

True-threats doctrine covers content-based prosecutions for single utterances of "pure speech," which need not even be communicated to the subject of the threat. *Watts v. United States*, 394 U.S. 705, 707, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (*per curiam*). The First Amendment would normally place strict limits on such prosecutions. So there is typically a need to determine whether the speech in question falls within the traditionally unprotected category of true threats.

This is not such a case, however. Petitioner was convicted for "stalking [causing] serious emotional distress" for a combination of threatening statements and repeated, unwanted, direct contact with C. W. 497 P.3d 1039, 1043 (Colo. App. 2021).[1] This kind of prosecution raises fewer First Amendment concerns for a variety of reasons. Stalking can be carried out through speech but need not be, which requires less First Amendment scrutiny when speech is swept in. See, *e.g.*, *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 62,

126 S.Ct. 1297, 164 L.Ed.2d 156 (2006). The content of the repeated communications can sometimes be irrelevant, such as persistently calling someone and hanging up, or a stream of "utterly prosaic" communications. *Ante*, at ——. Repeatedly forcing intrusive communications directly into the personal life of "an unwilling recipient" also enjoys less protection. *Rowan v. Post Office Dept.*, 397 U.S. 728, 738, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970). Finally, while there is considerable risk with a single intemperate utterance that a speaker will "accidentally or erroneously incur liability," *ante*, at —— (internal quotation marks and alterations omitted), that risk is far reduced with a course of repeated unwanted contact. Take, for example, petitioner continuously contacting C. W. despite her blocking him.

[1]     The statute of conviction applies to someone who "[r]epeatedly follows, approaches, contacts, places under surveillance, or makes any form of communication with another person ... in a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person ... serious emotional distress." Colo. Rev. Stat. § 18–3–602(1)(c) (2022).

Given this, prosecuting threatening statements made as part of a course of stalking does not squarely present the hardest questions about the *mens rea* required to prosecute isolated utterances based solely on their content.[2] True-threats doctrine came up below only because of the lower courts' doubtful assumption that petitioner could be prosecuted only if his actions fell under the true-threats exception. I do not think that is accurate, given the lessened First Amendment concerns at issue. In such cases, recklessness is amply sufficient. And I would stop there. There is simply no need to reach out in this stalking case to determine whether anything more than recklessness is needed for punishing true threats generally.

[2]     For these reasons, stalking prosecutions that do not rely on the content of communications would raise even fewer First Amendment concerns.

## II

**\*10**   Lest there be any doubt, the First Amendment stakes around the definition of "true threats" are high indeed. The First Amendment's mantle covers speech that is "vituperative, abusive and inexact." *Watts*, 394 U.S. at 708, 89 S.Ct.

1399. "It might be tempting to dismiss" seemingly low-value speech "as unworthy of ... robust First Amendment protections." *Mahanoy Area School Dist.* v. *B. L.*, 594 U. S. ——, ——, 141 S.Ct. 2038, 2048, 210 L.Ed.2d 403 (2021). Yet "[m]ost of what we say to one another lacks 'religious, political, scientific, educational, journalistic, historical, or artistic value' (let alone serious value), but it is still sheltered from Government regulation." *Stevens*, 559 U.S. at 479, 130 S.Ct. 1577 (emphasis deleted). First Amendment vigilance is especially important when speech is disturbing, frightening, or painful, because the undesirability of such speech will place a heavy thumb in favor of silencing it. In response, the Court has upheld First Amendment rights in the context of gruesome animal cruelty videos, *id.*, at 472, 130 S.Ct. 1577; cross burning, *Virginia v. Black*, 538 U.S. 343, 347–348, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003); hateful rhetoric in protests of the funerals of fallen soldiers, *Snyder v. Phelps*, 562 U.S. 443, 448–449, 458, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011); and computer-generated images of child pornography, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 239–240, 258, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002).

The risk of overcriminalizing upsetting or frightening speech has only been increased by the internet. Our society's discourse occurs more and more in "the 'vast democratic forums of the Internet' in general, and social media in particular." *Packingham v. North Carolina*, 582 U.S. 98, 104, 137 S.Ct. 1730, 198 L.Ed.2d 273 (2017) (citation omitted). "Rapid changes in the dynamics of communication and information transmission" have led to equally rapid and ever-evolving changes "in what society accepts as proper behavior." *Ontario v. Quon*, 560 U.S. 746, 759, 130 S.Ct. 2619, 177 L.Ed.2d 216 (2010). Different corners of the internet have considerably different norms around appropriate speech. Online communication can also lack many normal contextual clues, such as who is speaking, tone of voice, and expression. Moreover, it is easy for speech made in a one context to inadvertently reach a larger audience.

Without sufficient protection for unintentionally threatening speech, a high school student who is still learning norms around appropriate language could easily go to prison for sending another student violent music lyrics, or for unreflectingly using language he read in an online forum. "[A] drunken joke" in bad taste can lead to criminal prosecution. *Perez* v. *Florida*, 580 U. S. 1187, 137 S.Ct. 853, 197 L.Ed.2d 480 (2017) (SOTOMAYOR, J., concurring in denial of certiorari). In the heat of the moment, someone may post an enraged comment under a news story about a controversial

topic. Another person might reply equally heatedly. In a Nation that has never been timid about its opinions, political or otherwise, this is commonplace.

Many of this Court's true-threats cases involve such charged political speech. See *Black*, 538 U.S. at 348–349, 123 S.Ct. 1536 (Ku Klux Klan rally); *Watts*, 394 U.S. at 707, 89 S.Ct. 1399 (antiwar protest); *Rogers v. United States*, 422 U.S. 35, 41–42, 47–48, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975) (MARSHALL, J., concurring) (opposition to Nixon's policies toward China). *Amici* give further contemporary examples of such speech from across the political spectrum. See, *e.g.*, Brief for American Civil Liberties Union et al. as *Amici Curiae* 24–29. Much of this speech exists in a gray area where it will be quite hard to predict whether a jury would find it threatening. And the ubiquity of such speech raises the possibility of highly discretionary enforcement.

The burdens of overcriminalization will fall hardest on certain groups. A jury's determination of when angry hyperbole crosses the line will depend on amorphous norms around language, which will vary greatly from one discursive community to another. Juries' decisions will reflect their "background knowledge and media consumption." *Minnesota Voters Alliance* v. *Mansky*, 585 U. S. ——, ——, 138 S.Ct. 1876, 1890, 201 L.Ed.2d 201 (2018). "[S]peakers whose ideas or views occupy the fringes of our society have more to fear, for their violent and extreme rhetoric, even if intended simply to convey an idea or express displeasure, is more likely to strike a reasonable person as threatening." *United States v. White*, 670 F.3d 498, 525 (C.A.4 2012) (FLOYD, J., concurring in part and dissenting in part). Members of certain groups, including religious and cultural minorities, can also use language that is more susceptible to being misinterpreted by outsiders. And unfortunately yet predictably, racial and cultural stereotypes can also influence whether speech is perceived as dangerous. See, *e.g.*, A. Dunbar, C. Kubrin, & N. Scurich, The Threatening Nature of "Rap" Music, 22 J. Psychol. Pub. Pol'y & L. 281, 281–282, 288–290 (2016).

**\*11** On the other hand, the internet has also made stalking and harassment even easier. Stalking can be devastating and dangerous. See Brief for First Amendment Scholars as *Amici Curiae* 7–8. Lives can be ruined, and in the most tragic instances, lives are lost. *Ibid.* Harassers can hide behind online anonymity while tormenting others. This happens in the context of intimate relationships and it happens with strangers. Overly constraining our society's ability to respond

to stalking would come at a real cost. For the reasons given, however, a *mens rea* standard for true threats would not hinder stalking prosecutions. See *supra*, at —— – ——.

Even isolated threatening speech can do real harm. Such speech not only disrupts lives, it can silence the speech of others who become afraid to speak out. A *mens rea* requirement would not, however, present an uncommon or insurmountable barrier to true-threats prosecutions.[3] Nonetheless, under such a standard, there will be some speech that some find threatening that will not and should not land anyone in prison.

[3]    Intent requirements are common, including for incitement that results in actual violence, not just the threat of it. See *infra*, at —— – ——. For that reason there are longstanding frameworks for determining when someone is not guilty by reason of insanity, and when delusions do (and do not) defeat a showing of intent. See, *e.g.*, 1 W. LaFave, Substantive Criminal Law §§ 7.1(a), (b) (3d ed. 2018); 2 *id.*, § 9.2.

### III

These high First Amendment stakes are further reason for caution when delineating the boundaries of what constitutes a true threat. In undertaking that analysis, the Court and I part ways on the order of operations. The Court begins by defining true threats as all objectively threatening speech, entirely independent of whether the speaker intended to be threatening, *ante*, at ——, and the lead dissent agrees, *post*, at —— – —— (opinion of BARRETT, J.). The Court gets there by relying on this Court's interpretation of the word "threat" in a federal statute. *Ante*, at —— (citing *Elonis v. United States*, 575 U.S. 723, 733, 135 S.Ct. 2001, 192 L.Ed.2d 1 (2015)). The Court declares all such speech categorically unprotected, and then asks what "buffer zone" is needed in order to protect other, unthreatening speech. See *ante*, at —— – ——.

Respectfully, I see the analysis differently. The first step in the analysis should instead be to ask about the scope of the well-defined and narrow category of "true threats" as a constitutional matter. This Court has already warned about the danger of creating new categories of "unprotected speech" exempt from the ordinary First Amendment framework for balancing our society's commitment to free expression with other interests. *Stevens*, 559 U.S. at 470, 130 S.Ct. 1577. If

courts were at liberty to redefine what counts as a "threat" or "defamation" at will, this would achieve the same results as creating new categories of unprotected speech.

Thus, the Court must first ask whether there is a long-standing tradition of punishing inadvertent threats as "true threats." This Court's prior definition of the word "threat" in a federal statute, looking primarily to dictionaries, *Elonis*, 575 U.S. at 733, 135 S.Ct. 2001, does not tell us the scope of "true threats" for First Amendment purposes. *Elonis* itself made clear that it did "not ... consider any First Amendment issues." *Id.*, at 740, 135 S.Ct. 2001. Instead, a careful examination of this Court's true-threats precedent and the history of threat crimes does not support a long-settled tradition of punishing inadvertently threatening speech.

A

A natural place to begin, one might think, would be with this Court's most recent decision involving the First Amendment, *mens rea*, and true threats. Yet to read the Court's decision, one would have little idea that in a seminal 2003 decision, this Court held that a threat conviction could not stand because of an insufficient *mens rea* requirement. See *Black*, 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535. *Black* plainly sets out a conception of true threats as including a *mens rea* requirement.

**\*12**  In *Black*, the Court confronted the constitutionality of a Virginia statute that prohibited burning a cross with intent to intimidate. Only part of the decision in *Black* is contained in a five-Justice majority opinion. The other relevant parts of the decision were written by the Members of that majority, who split into a four-Justice plurality and Justice Scalia's partial concurrence in judgment.

The majority explained why a prohibition on cross burning with intent to threaten was constitutional, beginning by defining the category of true threats. " 'True threats,' " the majority explained "encompass those statements where the speaker *means to* communicate a serious expression of an intent to commit an act of unlawful violence." *Id.*, at 359, 123 S.Ct. 1536 (emphasis added). However, "[t]he speaker need not actually intend to carry out the threat," as true threats also include intimidation alone. *Id.*, at 359–360, 123 S.Ct. 1536. And "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons *with the intent of* placing

the victim in fear of bodily harm or death." *Id.*, at 360, 123 S.Ct. 1536 (emphasis added).

To the extent the Virginia statute covered intentionally threatening cross burning, it was thus tailored to cover only true threats. Critically, however, the statute also provided that " '[a]ny such burning of a cross shall be prima facie evidence of an intent to intimidate.' " *Id.*, at 348, 123 S.Ct. 1536. In other words, the all-important intent requirement could be satisfied by the mere conduct itself.

Consistent with the majority's definition of true threats, both the plurality and Justice Scalia agreed that the lack of a sufficient intent requirement meant that a conviction under the statute could not stand. *Id.*, at 367, 379, 123 S.Ct. 1536. For the plurality, the intent requirement was "the very reason why a State may ban cross burning" because it "distinguish[ed]" between the constitutionally unprotected true threat of burning a cross with intent to intimidate and "cross burning [as] a statement of ideology." *Id.*, at 365– 366, 123 S.Ct. 1536.[4] For Justice Scalia, the "plurality [was] correct in all of this." *Id.*, at 372, 123 S.Ct. 1536 (opinion concurring in part, concurring in judgment in part, and dissenting in part). There was a constitutional need for a distinction between cross burning " ' 'intended to intimidate' ' " and cross burning as " ' 'a statement of ideology.' ' " *Ibid.* The plurality and Justice Scalia only parted ways as to whether to hold that the statute was "facially invalid," *id.*, at 367, 123 S.Ct. 1536 (plurality opinion), or just that the jury instructions made it unclear "whether the jury has rendered its verdict (*as it must*)" with sufficient consideration of "intent to intimidate," *id.*, at 380, 123 S.Ct. 1536 (opinion of SCALIA, J.) (emphasis added).

4       The lead dissent asserts that the *Black* plurality's decision was based on how the statute " 'ignore[d] all of the contextual factors that are necessary to decide whether a particular cross burning' was covered by the statute." *Post*, at —— (opinion of BARRETT, J.) (quoting 538 U.S. at 367, 123 S.Ct. 1536 (plurality opinion)). But some context is missing from this reading itself. The full sentence is "all of the contextual factors that are necessary to decide whether a particular cross burning *is intended to intimidate*." *Id.*, at 367, 123 S.Ct. 1536 (emphasis added). The plurality was thus concerned with context to the extent it was relevant to the *mens rea* requirement needed to render the

statute constitutional. *Id.*, at 365–366, 123 S.Ct. 1536.

**\*13** The through-line is not hard to discern. First, unprotected true threats include a subjective *mens rea* requirement. *Id.*, at 360, 123 S.Ct. 1536 (majority opinion). Second, as a result, "Virginia's statute does not run afoul of the First Amendment insofar as it bans cross burning with intent to intimidate." *Id.*, at 362, 123 S.Ct. 1536 (majority opinion). Third, a conviction could not stand if it had categorically dispensed with that intent requirement, *id.*, at 365–366, 123 S.Ct. 1536 (plurality opinion), or if the jury had insufficiently considered "intent to intimidate," *id.*, at 380, 123 S.Ct. 1536 (opinion of SCALIA, J.).

In sum, all five Justices in the *Black* majority agreed that a true-threats prosecution could not stand under the First Amendment without a sufficient subjective *mens rea* requirement. [5]

[5]    According to the Court today and the lead dissent, however, *Black* somehow managed not to say anything about the First Amendment *mens rea* requirement for true-threats prosecutions—while striking down a true-threat conviction under the First Amendment for an insufficient *mens rea* requirement. On this reading, *Black* only discussed intent because "the statute involved in the case required a showing of intent." *Ante*, at ——, n. 3; *post*, at ——, n. 4 (discussion of intent was "a reference to the *statutory* requirements for a conviction, not the *constitutional* requirements"). This puzzling interpretation does not explain why an illusory *mens rea* requirement in a Virginia law would pose any First Amendment problems if the Amendment did not impose a *mens rea* requirement of this kind. After all, "[w]hy would the First Amendment care how a jury goes about finding an [intent] element that is a matter of indifference to the Amendment?" *United States v. Heineman*, 767 F.3d 970, 980 (C.A.10 2014). The obvious answer, from *Black*'s reasoning to its holding, is that such a *mens rea* requirement was necessary for the statute to target true threats.

**B**

In defining true threats as "statements where the speaker means to communicate a serious expression of an intent to

commit an act of unlawful violence," *id.*, at 359, 123 S.Ct. 1536, the Court in *Black* echoed the traditional understanding of threats. Historically, threat crimes covered the same kind of subjectively threatening speech *Black* invoked.

In reviewing this history, it is also vital to keep in mind the nature of the inquiry. Removing speech from normal First Amendment scrutiny is a major shift in the balance of expression and public interest that our Constitution generally strikes. The inquiry is therefore whether there is a "long-settled tradition" of prohibiting inadvertently threatening speech. *Stevens*, 559 U.S. at 469, 130 S.Ct. 1577. None of the other opinions, however, identify a historical case that expressly raised the question whether a subjective *mens rea* is required and held that it is not. That is a remarkable thing when one considers that the sample size consists of decisions from both sides of the Atlantic across centuries.

There was a long tradition of crimes for threatening another person in order to extort them. See, *e.g.*, 1796 N. J. Laws § 57, p. 108. Colorado and the United States admit that this core category of threat crimes required intent.

Even beyond that, a subjective *mens rea* remained a key component of threat offenses. An 18th-century English statute made it a capital offense to "knowingly send any letter ... threatening to kill or murder any of his Majesty's subject or subjects" or to threaten arson. 27 Geo. II, c. 15, in 21 Eng. Stat. at Large 184 (1754). A leading treatise explained that the statute was "levelled against such whose *intention* it was [to] obtain their object by creating terror in [the victim's] mind." 2 W. Russell & D. Davis, Crimes & Misdemeanors *1845 (emphasis added).

**\*14** Consistent with this, defendants were convicted of "knowingly, wilfully, and feloniously" sending threatening letters. *Rex* v. *Tyler*, 1 Mood. 428, 168 Eng. Rep. 1330 (1835); *Rex* v. *Paddle*, Russ. & Ry. 484, 168 Eng. Rep. 910 (1822) (indictment for "knowingly, unlawfully, wickedly, and feloniously" sending a threatening letter); see also *King* v. *Girdwood*, 1 Leach 142, 168 Eng. Rep. 173 (1776) (indictment for "feloniously" sending a threatening letter). " '[K]nowingly and wilfully' effecting any result applies to those who know that the acts performed will have that effect, and perform them with the intention that such shall be their operation." 12 American and English Encyclopaedia of Law 522–524 (J. Merrill ed. 1890); see also J. Boag, Imperial Lexicon of the English Language 530 (1850) (defining

"felonious" as "with the deliberate purpose to commit a crime").

The necessary *mens rea* could sometimes be inferred from the content of the letter, but could be rebutted by other evidence. See *King* v. *Philipps*, 6 East 464, 475, 102 Eng. Rep. 1365, 1369 (1805). Courts thus considered "the threat intended to be made by the prisoner" and "what he meant by what he had written" in determining whether he had violated the statute. *Regina* v. *Hill*, 5 Cox 233, 235 (Crim. Cas. 1851); see also *King* v. *John and Mary Hammond*, 1 Leach 444, 446, 168 Eng. Rep. 324, 325 (1787) (describing the offense of sending a threatening letter "to the party whose fears the threat it contains was calculated to alarm").

Threat laws in the United States were of a piece. Some state laws about threats expressly required maliciousness. See Me. Rev. Stat., Tit. 12, ch. 154, § 26 (1840); 1884 La. Acts No. 64, § 1, p. 86. Courts more generally emphasized the importance of a *mens rea* requirement. See, *e.g.*, *State v. Benedict*, 11 Vt. 236, 239 (1839). The North Carolina Supreme Court, for example, singled out threats as quintessential examples of offenses where it is "necessary" to prove the "*intent* of the particular letter." *State v. Murphy*, 84 N.C. 742, 743–744 (1881). And where state statutes may have been silent on intent to threaten, courts read such requirements in. See *Commonwealth v. Morton*, 140 Ky. 628, 631, 131 S.W. 506, 507–508 (1910) (letter must be "calculated to alarm, disturb, intimidate, or injure"); see also *State v. Stewart*, 90 Mo. 507, 512, 2 S.W. 790, 792 (1887) (jury instruction requiring that " 'defendant intended to threaten' ").

Leading treatises also explained the importance of *mens rea*. See 25 American and English Encyclopaedia of Law 1071 (C. Williams ed. 1894) (when there is a question as to "whether or not the letter contains the threat alleged, the intent is a question for the jury"); see also 2 R. Anderson, Wharton's Criminal Law and Procedure § 803, pp. 659–660 (1957) (threats must be "intended to put the person threatened in fear of bodily harm"); 2 J. Bishop, Commentaries on the Criminal Law § 1201, p. 664 (6th ed. 1877) ("The intent, both under the unwritten law and under the statutes, must be evil").

Against that backdrop, I return to the inquiry at hand: whether there is a "long-settled" or "well-established" history of prosecuting inadvertently threatening speech. There is no line of cases or pattern of statutes affirmatively stating that an objective standard is sufficient.

C

Put together, *Black* and the history point to an intent requirement. When *Black* defined and analyzed true threats in terms of intent, there is no reason to think the Court used intent to mean anything less than its traditional definition of purpose or knowledge. See, *e.g.*, *Tison*, 481 U.S. at 150, 107 S.Ct. 1676. Nor would a recklessness standard play the necessary role of distinguishing between cross burning that is " 'intended to intimidate' ... and nonintimidating cross burning [that] cannot be prohibited." 538 U.S. at 372, 123 S.Ct. 1536 (opinion of SCALIA, J.). Given the violent history of the symbol, it is hard to imagine that any politically motivated cross burning done within view of the public could be carried out without awareness of some risk a reasonable spectator would feel threatened. See *id.*, at 388–391, 123 S.Ct. 1536 (THOMAS, J., dissenting). Recklessness, which turns so heavily on an objective person standard, would not have been enough.

**\*15**  As to the history, it is true that over time courts have often used a wide variety of terms to describe mental states. See, *e.g.*, *Morissette v. United States*, 342 U.S. 246, 252, 72 S.Ct. 240, 96 L.Ed. 288 (1952). Yet "[t]he element of intent in the criminal law has traditionally been viewed as a bifurcated concept embracing either the specific requirement of purpose or the more general one of knowledge or awareness." *United States v. United States Gypsum Co.*, 438 U.S. 422, 445, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); see also *Tison*, 481 U.S. at 150, 107 S.Ct. 1676; *Carter v. United States*, 530 U.S. 255, 270, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000) (describing "feloniously" as equivalent to " 'intent' "). And at the very least, there is no well-settled history showing that it is enough for a defendant to be merely aware of some risk that their statements could be threatening. See, *e.g.*, *Borden v. United States*, 593 U. S. ——, ——, 141 S.Ct. 1817, 1824, 210 L.Ed.2d 63 (2021) (plurality opinion) (recklessness requires awareness of a level of risk that "need not come anywhere close to a likelihood"). The history is, instead, replete with the enduring and commonsense pairing of threats and intent.

D

The Court, eschewing *Black* and history, instead reaches its result based on the need for a "buffer zone" drawn by analogy to other categories of unprotected speech. *Ante*, at ——. For the reasons above, I do not think we can leap ahead to

this question. With that caveat, I agree with the Court that precedent in other areas of unprotected speech and concerns about chilling support a subjective *mens rea* requirement for true threats. Yet these same chilling concerns only further buttress the conclusion that true threats should be limited to intentionally threatening speech. Indeed, in the concurrence by Justice Marshall that the Court invokes, *ante*, at ——–——, he advocated "requir[ing] proof that the speaker intended his statement to be taken as a threat," based on concerns about punishing "pure speech." *Rogers*, 422 U.S. at 47–48, 95 S.Ct. 2091. In determining the appropriate *mens rea*, the Court analogizes to three categories of traditionally unprotected speech: incitement, obscenity, and defamation. None of these warrants expanding the narrow boundaries of true threats.

1

Speech inciting harm is the closest cousin to speech threatening harm. Both incitement and threats put other people at risk, and both "sprin[g] from [Justice] Holmes's 'clear and present danger' test." G. Blakey & B. Murray, Threats, Free Speech, and the Jurisprudence of the Federal Criminal Law, 2002 B. Y. U. L. Rev. 829, 1069 (2002). Like true threats, incitement's scope is defined in terms of both intention and effect, covering speech "[1] intended to produce, and [2] likely to produce, *imminent* disorder." *Hess v. Indiana*, 414 U.S. 105, 109, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (*per curiam*).

Despite their similar nature and source, the Court today draws a hard line between the two. Incitement requires " 'inten[t].' " *Ante*, at ——. While for threats, the speaker need only be "aware that others could regard his statements as threatening violence and delive[r] them anyway." *Ante*, at —— (internal quotation marks omitted). The Court justifies this asymmetry by the idea "that incitement to disorder is commonly a hair's-breadth away from political 'advocacy,' " *ante*, at ——, and the lead dissent says much the same, *post*, at —— (opinion of BARRETT, J.). These opinions offer little basis for distinguishing threats on this ground, as this Court's own cases show time and again how true-threats prosecutions sweep in political speech. See *Black*, 538 U.S. at 348–349, 123 S.Ct. 1536; *Watts*, 394 U.S. at 707, 89 S.Ct. 1399 (antiwar protest); *Rogers*, 422 U.S. at 41–42, 95 S.Ct. 2091 (MARSHALL, J., concurring) (opposition to Nixon's policies toward China).[6] Not only that, but incitement itself is often only a hair's-breadth away from threats.

6    Nor is this limited to decisions by this Court. Threats cases sweep in political speech. See, *e.g.*, *State v. Taylor*, 379 N.C. 589, 590, 866 S.E.2d 740, 744 (2021). Incitement cases can sweep in nonpolitical speech. See, *e.g.*, *Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 264, n. 11, 267 (C.A.4 1997). And still other cases show how incitement and threats can often go hand in hand. See, *e.g.*, *State v. Carroll*, 456 N.J.Super. 520, 544–545, 196 A.3d 106, 120–121 (2018).

**\*16** Take the seminal incitement case *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). During a civil rights boycott, NAACP leader Charles Evers, brother of the murdered civil rights hero Medgar Evers, gave a series of heated speeches. See *id.*, at 898–902, 102 S.Ct. 3409. He intoned that "boycott violators would be 'disciplined' " and that " '[i]f we catch any of you going in any of them racist stores, we're gonna break your damn neck.' " *Id.*, at 902, 102 S.Ct. 3409. The Court acknowledged that in this charged context, these speeches "might have been understood as inviting an unlawful form of discipline or, at least, as intending to create a fear of violence." *Id.*, at 927, 102 S.Ct. 3409. Yet inflammatory and threatening as these speeches were, they did not constitute incitement. That was because "there [was] no evidence— apart from the speeches themselves—that Evers authorized, ratified, or directly threatened acts of violence." *Id.*, at 929, 102 S.Ct. 3409. His speeches were thus not " 'directed to inciting or producing imminent lawless action' " and he had not "specifically intended to further an unlawful goal." *Id.*, at 925, n. 68, 928, 102 S.Ct. 3409.

Under a recklessness rule, *Claiborne* would have come out the other way. So long as Evers had some subjective awareness of some risk that a reasonable person could regard his statements as threatening, that would be sufficient. It would be quite troubling indeed to adopt a rule rendering this Court's admirable defense of the First Amendment wrongly decided. Nor is *Claiborne* the only example. The foundational incitement case, *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (*per curiam*), extended First Amendment protections to armed Klan members uttering racial slurs, a warning that "there might have to be some revengeance taken," and plans for a " 'four hundred thousand strong' " march in two cities. *Id.*, at 446, 89 S.Ct. 1827. Then, as now, there would be at least some risk that a reasonable resident of those cities could feel threatened.

These concrete examples illustrate a more general principle. Speech inciting imminent and dangerous unlawful activity will reasonably be threatening to those who would be harmed by that illegality. In all such cases, whether seminal decisions by this Court or guilty pleas that barely see the inside of a courtroom, the Court's decision effectively downgrades to recklessness the *mens rea* required for incitement of unlawful force; prosecutors could now simply charge such offenses as true threats. This is particularly worrisome because the standard for recklessness decreases the lower the "social utility" of the conduct. 1 W. LaFave, Substantive Criminal Law § 5.4(f ) (3d ed. 2018). That is a troubling standard for juries in a polarized nation to apply in cases involving heated political speech. This collateral damage can be avoided, however, if intent to threaten is understood as part of a true threat, just like intent to incite is part of incitement.

2

While obscenity is a step further afield of true threats and incitement, examination of this Court's obscenity case law further supports an intent requirement for prosecutions of true threats.

The Constitution " ' requires proof of scienter ' " in part " 'to compensate for the ambiguities inherent in the definition of obscenity.' " *Hamling v. United States*, 418 U.S. 87, 123, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). This is in line with this Court's more general observation that "vagueness" of "content-based regulation of speech" is of "special concern" when it comes to "criminal statute[s]." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 871–872, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). [7]

[7]  Analogously, the Court's civil defamation case law recognizes that heightened liability can require a heightened *mens rea*; even as to nonpublic figures, a higher standard must be met for punitive damages in certain cases. See, *e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349–350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

Specifically, the Court has held that a "knowledge" *mens rea* is sufficient for obscenity: "It is constitutionally sufficient that the prosecution show that a defendant had knowledge of the contents of the materials he distributed, and that he knew the character and nature of the materials." *Hamling*, 418 U.S. at 123, 94 S.Ct. 2887. This ensures that "not innocent but *calculated purveyance* of filth ... is exorcised." *Id.*, at 122, 94 S.Ct. 2887 (internal quotation marks omitted). While the Court today asserts that this Court has "never determined the precise *mens rea*" for obscenity, *ante*, at ——, n. 6, the Court has cited a knowledge standard approvingly for half a century, see *Hamling*, 418 U.S. at 123, 94 S.Ct. 2887; *Elonis*, 575 U.S. at 739, 135 S.Ct. 2001. [8] Applying that standard to threats, the " 'calculated purveyance' of a threat would require that [a defendant] know the threatening nature of his communication." *Id.*, at 739, 135 S.Ct. 2001.

[8]  The Court has held, however, that recklessness is sufficient for child pornography. See *Osborne v. Ohio*, 495 U.S. 103, 115, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990). This Court has emphasized time and again how child pornography is "a special case" because "[t]he market for child pornography [is] 'intrinsically related' to the underlying abuse" and thus " 'an integral part of the production of such materials, an activity illegal throughout the Nation.' " *United States v. Stevens*, 559 U.S. 460, 471, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (quoting *New York v. Ferber*, 458 U.S. 747, 759, 761, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)); see also *Osborne*, 495 U.S. at 110–111, 110 S.Ct. 1691. Child pornography, with its integral ties to separate criminal conduct, is not a strong analogue for threats, which can be fleeting statements in total isolation from any other criminality (though it is a stronger analogy to threats as part of an unlawful course of stalking). Yet the Court's decision today puts child pornography on a First Amendment par with overheated political speech or violent song lyrics.

**\*17**  The considerations that drove this Court to approve a higher *mens rea* for obscenity apply here as well. With obscenity, the ambiguity comes partly from the reliance on " 'contemporary community standards' " to define what is obscene. *Hamling*, 418 U.S. at 129, 94 S.Ct. 2887. Such a standard is notoriously amorphous, and will change a great deal between communities and over time. The same chilling concerns apply to true threats. A recklessness standard based on what a reasonable person could find threatening will depend on ever-shifting community norms around language and when heated speech crosses the line from overly aggressive to criminal. See *supra*, at —— – ——. [9]

9          There is a further safeguard in obscenity cases. Something is obscene if "taken as a whole, [it] lacks serious literary, artistic, political, or scientific value." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 574, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002) (internal quotation marks omitted). An intent requirement can provide a similar safeguard for threats. As *Virginia v. Black*, 538 U.S. 343, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003), explained, requiring intent distinguishes between speech intended to intimidate and speech intended to express a political statement. *Id.*, at 365–366, 123 S.Ct. 1536 (plurality opinion); *id.*, at 372, 123 S.Ct. 1536 (opinion of SCALIA, J.).

3

Finally, the Court relies heavily upon this Court's framework for defamation. Specifically, the Court analogizes to the "reckless disregard" standard for defamation of public figures or punitive damages for certain claims involving private figures. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

Yet while civil defamation may be "the best known and best theorized example" of unprotected speech, *ante*, at ——, the same does not go for criminal prosecution of defamation. It is true that this Court in 1964 invalidated a prosecution for criminal libel for failing to apply the *Sullivan* standard, which covers "only those false statements made with a high degree of awareness of their probable falsity." *Garrison v. Louisiana*, 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Yet the Court expressed strong skepticism of the very concept of criminal prosecutions for libel and noted the salutary trend of its "virtual disappearance." *Id.*, at 69–70, 85 S.Ct. 209. The Court approvingly cited the Model Penal Code's recommendation that criminal libel be limited to speech likely to cause a breach of the peace and "calculated" to do so. *Id.*, at 70, 85 S.Ct. 209. This is not a promising theoretical springboard for determining the *mens rea* required to criminalize other speech.

If the Court were correct that the *Sullivan* standard is the appropriate analogy, however, then this standard should guide how to analyze recklessness in true-threats prosecutions. The generic formulation of recklessness requires that an individual disregard a relatively unspecified level of risk that the harm in question will occur. See *Borden*, 593 U.

S., at ——, 141 S.Ct., at 1823–1824 (plurality opinion). Within that potentially broad range, *Sullivan* provides a more definite and demanding level of risk, reflecting the First Amendment concerns at stake. The Court has "made clear that the defendant must have made the false publication with a high degree of awareness of probable falsity or must have entertained serious doubts as to the truth." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (internal quotation marks and ellipsis omitted). This makes sense. Allowing liability for awareness of a small chance that a story may be false would undermine the very shield *Sullivan* erects.

For similar reasons, after today's ruling, future courts grappling with how to articulate the appropriate level of recklessness in true-threats cases would be well served to consult the *Sullivan* standard. The equivalent to *Sullivan* for true threats would require a high degree of awareness that a statement was probably threatening or serious doubts as to the threatening nature of the statement. This could avoid the chilling that would arise from a more amorphous and easily satisfied standard.

4

 *18  This Court's various frameworks for unprotected speech do not speak with one voice, as perhaps befits the First Amendment. The above survey does not, however, give reason to depart from the traditional understanding of true threats. To the contrary, this case law supports keeping true threats within their traditional bounds. Incitement similarly requires intent. The same chilling concerns that have led this Court to approve a knowledge requirement for obscenity are present with true threats. And to the extent the civil defamation context is relevant, at the very least, it points to a precise and demanding form of recklessness. [10]

10         The lead dissent headlines its analysis by pointing to this Court's case law on "fighting words." *Post*, at —— – —— (opinion of BARRETT, J.). This is an unlikely candidate for a broader theory of the First Amendment. For "nearly three-quarters of a century ... the Court has never ... upheld a fighting words conviction" and "[t]he cumulative impact of [the Court's] decisions is to make it unlikely that a fighting words law could survive." E. Chemerinsky, The First Amendment 1094 (6th

ed. 2019). It is not hard to see why such convictions would be unlikely to pass First Amendment muster; the leading case involved a Jehovah's Witness distributing literature who was arrested for breach of the peace for calling a public official a " 'damned Fascist.' " *Chaplinsky v. New Hampshire*, 315 U.S. 568, 569, 573–574, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). Drawing upon a conviction like the one in *Chaplinksy* as the proper model for criminalizing political speech is proof itself of the serious risks with the lead dissent's approach. In any event, as to the question at hand, when such breach of the peace offenses involved threats, intent to threaten was required. See 2 R. Anderson, Wharton's Criminal Law and Procedure § 803, pp. 659–660 (1957).

IV

Maintaining true threats doctrine within its traditional boundaries will guard against the overcriminalization of a wide range of political, artistic, and everyday speech based on its content alone. This does not mean that unintentionally threatening communications are exempt from regulation, far from it. As explained above, there are far fewer First Amendment concerns with stalking laws that punish repeated, targeted, unwanted conduct and accompanying speech. For that reason, recklessness is quite sufficient. As to true threats, intent is neither an unusual nor an insurmountable bar. "[C]ourts and juries every day pass upon knowledge, belief and intent ... having before them no more than evidence of ... words and conduct, from which, in ordinary human experience, mental condition can be inferred." *American Communications Assn. v. Douds*, 339 U.S. 382, 411, 70 S.Ct. 674, 94 L.Ed. 925 (1950).

* * *

I agree with the Court's conclusion that the First Amendment requires a subjective *mens rea* in true-threats cases, and I also agree that recklessness is amply sufficient for this case. Yet I would stop there, leaving for another day the question of the specific *mens rea* required to prosecute true threats generally. If that question is reached, however, the answer is that true threats encompass a narrow band of intentional threats. Especially in a climate of intense polarization, it is dangerous to allow criminal prosecutions for heated words based solely on an amorphous recklessness standard. Our society has often concluded that an intent standard sets a proper balance between safety and the need for a guilty

mind, even in cases that do not involve the First Amendment. Surely when the power of the State is called upon to imprison someone based on the content of their words alone, this standard cannot be considered excessive. Because I part ways with the Court on this score, I respectfully concur only in part and in the judgment.

Justice THOMAS, dissenting.
**\*19** I join Justice BARRETT's dissent in full. I write separately to address the majority's surprising and misplaced reliance on *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In *New York Times*, this Court held that the First Amendment bars public figures from recovering damages for defamation unless they can show that the statement at issue was made with " 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.*, at 280, 84 S.Ct. 710. Like the majority's decision today, "*New York Times* and the Court's decisions extending it were policy-driven decisions masquerading as constitutional law." *McKee v. Cosby*, 586 U. S. ——, ——, 139 S.Ct. 675, 676, 203 L.Ed.2d 247 (2019) (THOMAS, J., concurring in denial of certiorari). Instead of simply applying the First Amendment as it was understood at the time of the Founding, "the Court fashioned its own ' "federal rule[s]" ' by balancing the 'competing values at stake in defamation suits.' " *Ibid.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334, 348, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)); see also *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 501–502, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (acknowledging that "the rule enunciated in the *New York Times* case" is "largely a judge-made rule of law," the "content" of which is "given meaning through the evolutionary process of common-law adjudication"). "The constitutional libel rules adopted by this Court in *New York Times* and its progeny broke sharply from the common law of libel, and there are sound reasons to question whether the First and Fourteenth Amendments displaced this body of common law." *McKee*, 586 U. S., at ——, 139 S.Ct., at 678 (opinion of THOMAS, J.). Thus, as I have previously noted, "[w]e should reconsider our jurisprudence in this area." *Id.*, at ——, 139 S.Ct., at 682; see also *Berisha* v. *Lawson*, 594 U. S. ——, 141 S.Ct. 2424, 210 L.Ed.2d 991 (2021) (THOMAS, J., dissenting from denial of certiorari).

I am far from alone. Many Members of this Court have questioned the soundness of *New York Times* and its numerous extensions. See, *e.g.*, *Berisha*, 594 U. S., at —— – ——, 141 S.Ct., at 2428–2430 (GORSUCH, J., dissenting from

denial of certiorari); *Coughlin v. Westinghouse Broadcasting & Cable, Inc.*, 476 U.S. 1187, 106 S.Ct. 2927, 91 L.Ed.2d 554 (1986) (BURGER, C. J., joined by REHNQUIST, J., dissenting from denial of certiorari); *Gertz*, 418 U.S. at 370, 94 S.Ct. 2997 (WHITE, J., dissenting); *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 62, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (HARLAN, J., dissenting); *id.*, at 78, 91 S.Ct. 1811 (MARSHALL, J., dissenting); *Rosenblatt v. Baer*, 383 U.S. 75, 92, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966) (STEWART, J., concurring); see also E. Kagan, A Libel Story: *Sullivan* Then and Now, 18 L. & Soc. Inquiry 197, 207 (1993); J. Lewis & B. Ottley, *New York Times v. Sullivan* at 50, 64 DePaul L. Rev. 1, 35–36 (2014) (collecting statements from Justice SCALIA); cf. *Tah v. Global Witness Publishing, Inc.*, 991 F.3d 231, 251–256 (CADC 2021) (SILBERMAN, J., dissenting in part) (questioning the doctrine). It is thus unfortunate that the majority chooses not only to prominently and uncritically invoke *New York Times*, but also to extend its flawed, policy-driven First Amendment analysis to true threats, a separate area of this Court's jurisprudence.

Justice BARRETT, with whom Justice THOMAS joins, dissenting.

Billy Counterman was convicted under a Colorado law that prohibits true threats. As everyone agrees, the statute requires that the speaker understand the meaning of his words. *Ante*, at ——, n. 1. The question is what more the First Amendment requires. Colorado maintains that an *objective* standard is enough—that is, the government must show that a reasonable person would regard the statement as a threat of violence. Counterman, however, argues that the First Amendment requires a *subjective* test—that is, the speaker himself must intend or know the threatening nature of the statement.

It should be easy to choose between these positions. True threats do not enjoy First Amendment protection, and nearly every other category of unprotected speech may be restricted using an objective standard. Nonetheless, the Court adopts a subjective standard, though not quite the one advanced by Counterman. The Court holds that speakers must recklessly disregard the threatening nature of their speech to lose constitutional protection. Because this unjustifiably grants true threats preferential treatment, I respectfully dissent.

I

Since the founding, the First Amendment has allowed the government to regulate certain "areas of speech" "because of their constitutionally proscribable content." *R.A.V. v. St. Paul*, 505 U.S. 377, 382–383, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (emphasis deleted). This includes true threats, which are "serious expression[s] of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003); see also *R. A. V.*, 505 U.S. at 388, 112 S.Ct. 2538 ("[T]hreats of violence are outside the First Amendment"). True threats carry little value and impose great cost. See *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) ("[A]ny benefit that may be derived from [true threats] is clearly outweighed by the social interest in order and morality"). "[B]y their very utterance," true threats "inflict injury." *Ibid.* They provoke "the fear of violence," create "disruption," give rise to "the possibility that the threatened violence will occur"—and the list goes on. *Black*, 538 U.S. at 360, 123 S.Ct. 1536 (internal quotation marks omitted). [1]

[1]  Indeed, the Colorado Legislature considered these very harms when it enacted the statute at issue here. The statutory findings explain that stalking, harassment, and threats have "an immediate and long-lasting impact on quality of life as well as risks to security and safety of the victim and persons close to the victim." Colo. Rev. Stat. §§ 18–3–601(1)(f), 18–3–602(1) (2022). So the legislature passed the statute to "encourag[e] and authoriz[e] effective intervention" before the covered conduct could "escalate into behavior that has even more serious consequences." § 18–3–601(2).

*20  The nature of a true threat points to an objective test for determining the scope of First Amendment protection: Neither its "social value" nor its potential for "injury" depends on the speaker's subjective intent. *Chaplinsky*, 315 U.S. at 572, 62 S.Ct. 766. They can relate, of course—a speaker who does not intend to threaten is less likely to utter a statement that could be taken that way. But the Constitution ultimately declines to protect true threats for objective reasons, not subjective ones. So an objective test "complements" the explanation for excluding threats of violence from First Amendment protection in the first place." *United States v. Jeffries*, 692 F.3d 473, 480 (C.A.6 2012).

## II

The Court agrees that "[t]he existence of a threat depends not on 'the mental state of the author,' but on 'what the statement conveys' to the person on the other end." *Ante*, at ——. And it acknowledges that "[w]hen the statement is understood as a true threat, all the harms that have long made threats unprotected naturally follow." *Ibid.* Nonetheless, the Court holds Colorado's statute unconstitutional. Why? Because the Court installs a prophylactic buffer zone to avoid chilling protected speech—a buffer zone that protects true threats unless the speaker "consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Ante*, at ——, —— – ——. That reasoning is flawed.

### A

The Court's first error is awarding true threats "pride of place among unprotected speech." *Elonis v. United States*, 575 U.S. 723, 767, 135 S.Ct. 2001, 192 L.Ed.2d 1 (2015) (THOMAS, J., dissenting). We have held that nearly every category of unprotected speech may be regulated using an objective test. In concluding otherwise, the Court neglects certain cases and misreads others.

Start with fighting words—a category of unprotected speech that the Court skips past. Fighting words are "personally abusive epithets" that are "inherently likely to provoke violent reaction." *Cohen v. California*, 403 U.S. 15, 20, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). Under our precedent, legislatures may regulate fighting words even when the speaker does not intend to provoke the listener (or does not recklessly disregard that possibility). *Chaplinsky*, 315 U.S. at 572–573, 62 S.Ct. 766 (rejecting First Amendment challenge to a state law punishing "fighting words" according to a reasonable-person standard); *Cantwell v. Connecticut*, 310 U.S. 296, 309–310, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (statements unprotected when they are "likely to provoke violence and disturbance of good order, even though no such eventuality be intended"). Instead, we ask only whether "the ordinary citizen," using her "common knowledge," would reasonably understand the statement as a "direct personal insult." *Cohen*, 403 U.S. at 20, 91 S.Ct. 1780; see also *Texas v. Johnson*, 491 U.S. 397, 409, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).

The Court similarly overlooks the category of "false, deceptive, or misleading" commercial speech. *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 638, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985); *In re R. M. J.*, 455 U.S. 191, 203, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982) ("Truthful advertising ... is entitled to the protections of the First Amendment," but "[m]isleading advertising may be prohibited entirely"); *Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy*, 512 U.S. 136, 142, 114 S.Ct. 2084, 129 L.Ed.2d 118 (1994) ("[F]alse, deceptive, or misleading commercial speech may be banned"). Here, too, our cases suggest that First Amendment protection depends on objective falsity rather than the speaker's intention. See *In re R. M. J.*, 455 U.S. at 202, 102 S.Ct. 929 ("[R]egulation—and imposition of discipline—are permissible where the particular advertising is *inherently likely to deceive* or where the record indicates that a particular form or method of advertising has *in fact been deceptive*" (emphasis added)); see also *Milavetz, Gallop & Milavetz, P. A. v. United States*, 559 U.S. 229, 250–253, 130 S.Ct. 1324, 176 L.Ed.2d 79 (2010). Thus, the government is "free to prevent the dissemination of commercial speech that is false, deceptive, or misleading," without regard to whether the speaker knew that the recipient would be deceived or misled. *Zauderer*, 471 U.S. at 638, 105 S.Ct. 2265.

**\*21**  Or take obscenity, which we have long held is "not protected by the freedoms of speech and press." *Roth v. United States*, 354 U.S. 476, 481, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Speech qualifies as obscene if the " 'average person, applying contemporary community standards,' " would conclude that "the work, taken as a whole, appeals to the prurient interest." *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). The jury must also make an objective judgment about whether the speech "depicts or describes" sexual conduct "in a patently offensive way," and whether it "lacks serious literary, artistic, political, or scientific value." *Ibid.* The speaker's " 'belief as to the obscenity or non-obscenity of the material is irrelevant.' " *Hamling v. United States*, 418 U.S. 87, 120–121, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974). So long as the defendant has "knowledge of the contents of the materials," her speech may be constitutionally regulated. *Id.*, at 123, 94 S.Ct. 2887. An objective, reasonable-person standard applies.

In an effort to bolster its position, the Court floats a different standard for obscenity laws, asserting that "the First Amendment demands proof of a defendant's mindset to make out an obscenity case." *Ante*, at ——. By "mindset,"

the Court apparently means that the defendant must have some awareness that an average person would consider the materials obscene. But the Court draws this conclusion from cases rejecting a *strict liability* standard—for example, we have held that the proprietor of a bookstore cannot be liable for possessing an obscene book unless he knew what was in it. *Smith v. California*, 361 U.S. 147, 149, 155, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); *Mishkin v. New York*, 383 U.S. 502, 510–512, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966); see also *Ginsberg v. New York*, 390 U.S. 629, 643–644, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).[2] Knowing what the material depicts is not the same as knowing how the average person would react to it—just as there is an important difference between Counterman's knowledge of what his words meant and his knowledge of how they would be perceived. Though the Court conflates the two, our obscenity cases have repeatedly refused to require the latter as a matter of constitutional law. *Hamling*, 418 U.S. at 120–123, 94 S.Ct. 2887; *Rosen v. United States*, 161 U.S. 29, 41–42, 16 S.Ct. 480, 40 L.Ed. 606 (1896). So obscenity doctrine does not help Counterman.

[2]     The Court also cites *Elonis v. United States, ante, at 8, 9, n. 4, 135 S.Ct. 2001*, which Counterman argues puts a "gloss" on obscenity doctrine, Tr. of Oral Arg. 6–7. While *Elonis* briefly discusses the necessary *mens rea* for a conviction under a federal obscenity statute, it does so only in dicta. 575 U.S. 723, 739–740, 135 S.Ct. 2001, 192 L.Ed.2d 1 (2015). *Elonis* does not alter the doctrinal framework for assessing the constitutionality of obscenity laws: That case involves true threats, not obscenity, and it interprets a federal statute, not the Constitution.

The Court leans hardest on defamation law, but its argument depends on a single, cherry-picked strand of the doctrine. Yes, *New York Times Co. v. Sullivan* requires public figures and public officials to show "actual malice" on a defamation claim, and we have defined "actual malice" as "knowledge that [the statement] was false" or "reckless disregard of whether it was false or not." 376 U.S. 254, 279–280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). But that is not the full story. A private person need only satisfy an objective standard to recover actual damages for defamation. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347–350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). And if the defamatory speech does not involve a matter of public concern, she may recover punitive damages with the same showing. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 760–761, 105

S.Ct. 2939, 86 L.Ed.2d 593 (1985) (plurality opinion). We have justified that distinction on the ground that public-figure defamation claims may deter "would-be critics of official conduct ... from voicing their criticism," which would "dampe[n] the vigor and limit the variety of public debate." *Sullivan*, 376 U.S. at 279, 84 S.Ct. 710. Not only that, but "the state interest in protecting" public figures is weaker, since they tend to "enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements." *Gertz*, 418 U.S. at 344, 94 S.Ct. 2997. So, despite what the Court says, *Sullivan* does not stand for the broad proposition that the First Amendment "demand[s] a subjective mental-state requirement." *Ante*, at ——. Instead, it simply raises the bar for borderline unprotected speech with high social value (because of its proximity to public discourse) and low potential for injury (because public figures can engage in counterspeech).

**\*22** *Sullivan*'s rationale does not justify a heightened *mens rea* for true threats. Because true threats are not typically proximate to debate on matters of public concern, the Court's newly erected buffer zone does not serve the end of protecting heated political commentary. Nor can public figures use counterspeech in the public square to protect themselves from serious threats of physical violence. And perversely, private individuals now have less protection from true threats than from defamation—even though they presumably value their lives more than their reputations. See *Gertz*, 418 U.S. at 347–350, 94 S.Ct. 2997. The Court has therefore extended *Sullivan* in a way that makes no sense on *Sullivan*'s own terms.

I will give the Court this much: Speakers must specifically intend to incite violence before they lose First Amendment protection. *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (*per curiam*) (defining incitement as "advocacy ... directed to inciting or producing imminent lawless action and likely to incite or produce such action"); see also *Hess v. Indiana*, 414 U.S. 105, 108–109, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (*per curiam*). Once more, however, our precedent itself explains the difference. Incitement, as a form of "advocacy," often arises in the political arena. See *Brandenburg*, 395 U.S. at 447, 89 S.Ct. 1827 (Ku Klux Klan rally held to plan a " 'marc[h] on Congress' "); *Hess*, 414 U.S. at 106, 94 S.Ct. 326 (antiwar demonstration); *Abrams v. United States*, 250 U.S. 616, 620, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (pamphlets about the President's " 'shameful, cowardly silence about the intervention in Russia' "). A specific intent requirement helps

draw the line between incitement and "political rhetoric lying at the core of the First Amendment." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 926–927, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). The Court does not contend that targeted threats and political commentary share a similarly close relationship.

In sum, our First Amendment precedent does not set a "baseline ban on an objective standard." *Ante*, at ——. Precedent does more than allow an objective test for true threats; on balance, it affirmatively supports one.

B

The Court's analysis also gives short shrift to how an objective test works in practice. Two key features of true threats already guard against the risk of silencing protected speech. Thus, there is no need to go further and adopt the Court's heightened standard.

First, only a very narrow class of statements satisfies the definition of a true threat. To make a true threat, the speaker must express "an intent to commit *an act of unlawful violence*." *Black*, 538 U.S. at 359, 123 S.Ct. 1536 (emphasis added). Speech that is merely "offensive," " 'poorly chosen,' " or "unpopular" does not qualify. Brief for Petitioner 31, 36, 42. The statement must also threaten violence "to a particular individual or group of individuals"—not just in general. *Black*, 538 U.S. at 359, 123 S.Ct. 1536. These tight guardrails distinguish true threats from public-figure defamation, the model for the Court's rule. While defamatory statements can cover an infinite number of topics, true threats target one: unlawful violence.

Second, the statement must be deemed threatening by a reasonable listener who is familiar with the "entire factual context" in which the statement occurs. *State v. Taveras*, 342 Conn. 563, 572, 271 A.3d 123, 129 (2022). This inquiry captures (among other things) the speaker's tone, the audience, the medium for the communication, and the broader exchange in which the statement occurs.[3] Each consideration helps weed out protected speech from true threats.

[3]    Colorado's test provides a good example. Juries must apply the following nonexhaustive factors to determine whether a statement is a true threat: "(1) the statement's role in a broader exchange,

if any, including surrounding events; (2) the medium or platform through which the statement was communicated, including any distinctive conventions or architectural features; (3) the manner in which the statement was conveyed (*e.g.*, anonymously or not, privately or publicly); (4) the relationship between the speaker and recipient(s); and (5) the subjective reaction of the statement's intended or foreseeable recipient(s)." *People in the Interest of R. D.*, 464 P.3d 717, 721–722 (Colo. 2020).

**\*23**  Our decision in *Black* illustrates the point. There, the Court considered a Virginia law that prohibited cross burning " 'with the intent of intimidating any person or group of persons.' " 538 U.S. at 348, 123 S.Ct. 1536. Notably, the statute included a presumption: " 'Any such burning of a cross shall be prima facie evidence of an intent to intimidate.' " *Ibid.* After three men were convicted under the statute, they challenged it as facially unconstitutional. We upheld the general prohibition on cross burning, concluding that the First Amendment allows the government to ban "a particular type of threat." *Id.*, at 362–363, 123 S.Ct. 1536. A plurality then went on to address the statutory presumption. While cross burning "may mean that a person is engaging in constitutionally proscribable intimidation," the plurality reasoned, the act is not monolithic. *Id.*, at 365, 123 S.Ct. 1536. Cross burning could be directed "at an individual" or "at a group of like-minded believers"; it could be done "on a neighbor's lawn" or "at a public rally"; it could be done with the property owner's "permission" or without it. *Id.*, at 366, 123 S.Ct. 1536. The presumption "blur[red] the line" between these different situations and "ignore[d] all of the contextual factors that are necessary to decide whether a particular cross burning" was covered by the statute or not.[4] *Id.*, at 365, 367, 123 S.Ct. 1536. Thus, the presumption was unconstitutionally overbroad.

[4]
As Justice SOTOMAYOR emphasizes, *ante*, at ——, n. 4, the plurality said that context informs "whether a particular cross burning is *intended to intimidate*," 538 U.S. at 367, 123 S.Ct. 1536 (emphasis added). But this was a reference to the *statutory* requirements for a conviction, not the *constitutional* requirements—the Virginia statute covered only threats made " 'with the intent of intimidating any person or group of persons.' " *Id.*, at 348, 123 S.Ct. 1536. At no point did the Court hold that the First Amendment demands

specific intent; on the contrary, it recognized that a statement made "with the intent of placing the victim in fear of bodily harm or death" is "*a type of true threat.*" *Id.*, at 360, 123 S.Ct. 1536 (emphasis added).

The *Black* plurality's reasoning can be boiled down to the following insight: When context is ignored, true threats cannot be reliably distinguished from protected speech. The reverse also holds: When context is properly considered, constitutional concerns abate. See, *e.g.*, *Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969) (*per curiam*) (concluding that a statement was "political hyperbole" instead of a true threat based on "context," "the expressly conditional nature of the statement," and the "reaction of the listeners").

One more point: Many States have long had statutes like Colorado's on the books. See Brief for Illinois et al. as *Amici Curiae* 16–17. Before we took this case, the vast majority of Courts of Appeals and state high courts had upheld these statutes as constitutional. So objective tests are effectively the status quo today, yet Counterman still struggles to identify past prosecutions that came close to infringing on protected speech. Tr. of Oral Arg. 28–30. The silence is telling.

### C

So is the silence in the historical record. Since 1791, true threats have been excluded from the "speech" protected by the First Amendment. *R. A.V.*, 505 U.S. at 382–383, 388, 112 S.Ct. 2538. If Counterman could show that a subjective requirement has been inherent in the definition of "true threat" since the founding, he would have a compelling case. But Counterman cannot make that showing.

For starters, he produces no evidence directly addressing the meaning of the First Amendment—nothing from state ratifying conventions, political commentary, or even early debates about efforts to regulate threats in ways that might threaten speech. That is not surprising at the federal level, because the Federal Government did not prohibit threats until the early 20th century. *Elonis*, 575 U.S. at 760, 135 S.Ct. 2001 (THOMAS, J., dissenting). Some States, however, both regulated threats and guaranteed the right to free speech in their own constitutions. *Id.*, at 760–761, 135 S.Ct. 2001. Yet even at the state level, there was apparently no discussion about the implications of these statutes for the constitutional right.

That void notwithstanding, the state threat statutes are the evidence on which Counterman seizes. He argues that they imposed a subjective *mens rea*, demonstrating that the founding generation thought that threats could be punished on no less. But as Justice THOMAS has already discussed in detail, this is incorrect. See *id.*, at 760–765, 135 S.Ct. 2001. Rather than a subjective *mens rea*, these statutes used an objective standard resembling Colorado's.

**\*24**  Even if they did require a heightened *mens rea*, though, these statutes would not carry the day for Counterman. The enactment of a statute against the backdrop of a free speech guarantee tends to show that the legislature thought the statute consistent with that guarantee. Thus, if the question were whether such statutes *violated* the First Amendment, their existence would be evidence to the contrary. But the question here is whether a subjective intent requirement is the constitutional floor. And because the legislature is always free to exceed the floor, the enactment of legislation does not necessarily reflect the legislature's view of the constitutional minimum.

At the end of the day, then, the best historical case for Counterman does not add up to much. He is plainly not asking the Court to enforce a historically sanctioned rule, but rather to fashion a new one.

### D

Even if a subjective test had a historical pedigree, the Court's chosen standard of recklessness certainly does not. Where does recklessness come from? It was not raised by the parties. Only the Solicitor General noted this possibility—and briefly at that. Brief for United States as *Amicus Curiae* 28–31. Nor did the courts below address recklessness; indeed, very few courts (of the many that have taken up the question) have settled on recklessness as the constitutional floor for true threats. See, *e.g.*, *State v. Mrozinski*, 971 N.W.2d 233, 243–245 (Minn. 2022); *In re J. J. M.*, 265 A.3d 246, 269–270 (Pa. 2021). Still, the Court adopts recklessness as "the right path forward." *Ante*, at ——. Its rationale is, at best, unclear.

The Court begins by acknowledging the " 'competing value[s]' " of "free expression" on one hand, and "profound harms ... to both individuals and society" on the other. *Ante*, at —— – ——. But why do these considerations point to recklessness? A knowledge or purpose standard would allow

more free expression, so maybe we should go higher. See *ante*, at ―― (SOTOMAYOR, J., concurring in part and concurring in judgment) ("chilling concerns only further buttress the conclusion that true threats should be limited to intentionally threatening speech"). An objective standard would cause less harm to victims, so perhaps lower is better. The optimal balance strikes me as a question best left to the legislature, which could calibrate the *mens rea* to the circumstance—for example, higher for the criminal context and lower for the civil. See Brief for Illinois et al. as *Amici Curiae* 28–30 (States "have a range of policy reasons for using subjective standards for penalizing threats of violence" and many "choose to require proof of a speaker's subjective mental state" in some situations but not others).

Nor does our First Amendment precedent buttress the Court's preferred standard. A recklessness requirement currently applies only to public-figure defamation claims. Incitement to violence calls for more. Fighting words, private-figure defamation, false commercial speech, and obscenity require less. I fail to see why, of all these categories of unprotected speech, public-figure defamation is the best analog for true threats. The reality is that recklessness is not grounded in law, but in a Goldilocks judgment: Recklessness is not too much, not too little, but instead "just right."

### III

Some may find Colorado's statute harsh, and the Court's decision seems driven in no small part by the heavy hammer of criminal punishment. See *ante*, at ―――; at ―― ―――, ―― – ――― (opinion of SOTOMAYOR, J.). While an objective test is "a familiar feature of civil liability in tort law," the " 'conventional requirement for criminal conduct' " is " '*awareness*' of some wrongdoing.' " *Elonis*, 575 U.S. at 737–738, 135 S.Ct. 2001. In keeping with this convention, we generally presume that "federal criminal statutes that are silent on the required mental state" nonetheless impose the "*mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct." *Id.*, at 736, 135 S.Ct. 2001 (internal quotation marks omitted). That is why we rejected an objective standard for the federal threat prohibition, 18 U.S.C. § 875(c). 575 U.S. at 737–739, 135 S.Ct. 2001. It is "the threatening nature of the communication" that "makes the conduct 'wrongful' "; thus, the statute is best interpreted to require that the defendant be aware of the impact of his speech. *Id.*, at 737, 135 S.Ct. 2001.

**\*25**  But this case is about the scope of the First Amendment, not the interpretation of a criminal statute. Accordingly, the Court's holding affects the *civil* consequences for true threats just as much as it restricts criminal liability. And the civil context underscores the danger of adopting a *Sullivan*-style buffer zone for true threats.

Consider, for example, threat victims who seek restraining orders to protect themselves from their harassers. See, *e.g.*, *United States v. Elonis*, 841 F.3d 589, 593 (C.A.3 2016) (defendant's wife sought a restraining order after he wrote on Facebook, "I'm not going to rest until your body is a mess, soaked in blood and dying from all the little cuts"). Civil orders can also keep individuals away from particular geographic areas. Imagine someone who threatens to bomb an airport, *State v. Johnston*, 156 Wash.2d 355, 358–359, 127 P.3d 707, 708–709 (2006), or "shoot up [a] courthous[e]," *State v. Draskovich*, 2017 S.D. 76, ¶3, 904 N.W.2d 759, 761. The speaker might well end up barred from the location in question—for good reason. Yet after today, such orders cannot be obtained without proof—not necessarily easy to secure—that the person who issued the threat anticipated that it would elicit fear. See Tr. of Oral Arg. 92–93.

The government can also opt to counteract true threats by means of civil enforcement actions. For instance, 18 U.S.C. § 248 prohibits "threat[s] of force" against any person "obtaining or providing reproductive health services" or "seeking to exercise the First Amendment right of religious freedom at a place of religious worship." The statute imposes a range of civil penalties, and it allows enforcement suits by both private persons and government officials. See, *e.g.*, *United States v. Dillard*, 795 F.3d 1191, 1196–1197 (C.A.10 2015) (Government brought § 248 action after defendant warned a health provider, "[y]ou will be checking under your car everyday—because maybe today is the day someone places an explosive under it"); *McCullen v. Coakley*, 573 U.S. 464, 491, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014) (noting that several States have similar laws). After today, these civil enforcement actions face a higher constitutional hurdle.

In addition, employers and school administrators often discipline individuals who make true threats. Consider the student who was expelled after "draft[ing] two violent, misogynic, and obscenity-laden rants expressing a desire to molest, rape, and murder" his ex-girlfriend. *Doe v. Pulaski Cty. Special School Dist.*, 306 F.3d 616, 619 (C.A.8 2002) (en banc). Or the one who was suspended after " 'talking about taking a gun to school' to 'shoot everyone he hates.' " *D. J.*

*M. ex rel. D.M. v. Hannibal Public School Dist. No. 60,* 647 F.3d 754, 758 (C.A.8 2011); *Lovell v. Poway Unified School District,* 90 F.3d 367, 369, 372–373 (C.A.9 1996) (similar); *Haughwout v. Tordenti,* 332 Conn. 559, 561–562, 211 A.3d 1, 3–4 (2019) (similar). True threats can also be expressed by a parent, a teacher, or an employee in another context altogether. See, *e.g., Taveras,* 342 Conn. at 567–569, 578, 271 A.3d at 126–128, 133 (parent); *Smith v. New York City Dept. of Ed.,* 109 App.Div.3d 701, 702–703, 972 N.Y.S.2d 221, 222 (2013) (teacher); *Diggs v. St. Louis,* 613 S.W.3d 858, 862, 864 (Mo. App. 2020) (correctional officer).

Barring some reason why the speech receives lesser constitutional protection, *e.g., Mahanoy Area School Dist. v. B. L.,* 594 U. S. ——, —— – ——, 141 S.Ct. 2038, 2044–2045, 210 L.Ed.2d 403 (2021), the Court's new rule applies to all of these situations. That can make all the difference in some cases. A delusional speaker may lack awareness of the threatening nature of her speech; a devious speaker may strategically disclaim such awareness; and a lucky speaker may leave behind no evidence of mental state for the government to use against her. The Court's decision thus sweeps much further than it lets on.

\* \* \*

**\*26** The bottom line is this: Counterman communicated true threats, which, "everyone agrees, lie outside the bounds of the First Amendment's protection." *Ante,* at ——. He knew what the words meant. Those threats caused the victim to fear for her life, and they "upended her daily existence." *Ante,* at ——. Nonetheless, the Court concludes that Counterman can prevail on a First Amendment defense. Nothing in the Constitution compels that result. I respectfully dissent.

**All Citations**

--- S.Ct. ----, 2023 WL 4187751

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.